IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LANCASTER FINE FOODS, INC., | : | |
| | : | CIVIL ACTION NO. 16-182 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DALMATIA IMPORT GROUP, INC., and MAIA MAGEE, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| DALMATIA IMPORT GROUP, INC., | : | |
| | : | CIVIL ACTION NO. 16-2767 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FOODMATCH, INC., LANCASTER FINE FOODS, INC., EARTH PRIDE ORGANICS, LLC, and MICHAEL S. THOMPSON, | : | |
| | : | |
| Defendants. | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Presently before the court is a motion for preliminary injunction by Dalmatia Import Group, Inc. ("Dalmatia") brought against FoodMatch, Inc. ("FoodMatch") and Lancaster Fine Foods, Inc. ("Lancaster") concerning alleged trademark infringement and trademark counterfeiting.  (Civil Action No. 16-2767, Doc. No. 1-30).  As explained below, the court grants the motion.

I.    **JURISDICTION**

1.    This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1332.

## II.   VENUE

2.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).   Additionally, the parties waived objections to venue, as well as personal jurisdiction, by consenting to transfer to this court pursuant to 28 U.S.C. § 1404(a).

## III.   PROCEDURAL HISTORY

3.   On February 8, 2016, Dalmatia commenced this action against FoodMatch by filing a complaint in the United States District Court for the Southern District of New York. (Doc. No. 1-1).[1]

4.   On March 25, 2016, Dalmatia filed its First Amended Complaint, which added Lancaster, Earth Pride Organics LLC ("Earth Pride"), Philip Meldrum ("Meldrum"), and Michael S. Thompson ("Thompson") as defendants.  (Doc. No. 1-28).[2]  The same day, Dalmatia filed two motions for preliminary injunction:  one against FoodMatch and Lancaster regarding alleged trademark infringement and trademark counterfeiting (Doc. No. 1-30), and a second against Lancaster and Earth Pride regarding alleged breach of contract (Doc. No. 1-32).  The court addresses the former motion here and the latter motion separately.   With respect to the former motion, Lancaster filed an opposition brief (Doc. No. 1-73), and FoodMatch filed an affidavit by Meldrum.  (Doc. No. 1-74).  Dalmatia filed a reply.  (Doc. No. 1-79).

5.   On June 6, 2016, the New York court entered a stipulation and order transferring the case pursuant to 28 U.S.C. § 1404 to this court.  (Doc. No. 1-101).

6.   Following two telephone conferences, this court agreed to the parties' proposal to resolve the preliminary injunction motion on the papers and argument, without discovery or an evidentiary hearing.   The court also permitted limited supplemental briefing. Dalmatia filed a

---

[1] All citations to the docket refer to Civil Action No. 16-2767.
[2] Subsequently Dalmatia voluntarily dismissed its claims against Meldrum.

supplemental brief on June 27, 2016. (Doc. No. 10).  Lancaster and Earth Pride filed a response on July 11, 2016.  Additionally, the parties submitted proposed findings of fact and conclusions of law.  The court heard oral argument on July 13, 2016.

## IV.    FINDINGS OF FACT

7.    After carefully considering the parties' papers, including their declarations and evidentiary submissions, and the argument of counsel, and after assigning such weight to the evidence as the court deemed proper, the pertinent facts are as follows.

### The Parties and Their Prior Relationship

8.    Dalmatia is a specialty food company that produces a product known as "fig spread," a food item sold with cheese products in grocery stores across the United States. Dalmatia has been selling its fig spread products (including "Original Fig Spread," "Orange Fig Spread," and "Sour Cherry Spread") for more than 15 years.

9.     In 1997, Dalmatia began selling its fig spread product under the trademark DALMATIA, the name of a region in Croatia familiar to the Dalmatia founders. Doc. No. 1-39 at ¶ 4 ("*Magee Decl.*"); *Dalmatia Ex. A* (Doc. No. 47-1).  The product was instantly successful, winning industry awards and garnering substantial sales.  *Magee Decl.* ¶ 6.

10.    To protect its brand, Dalmatia secured federal trademark registrations, including an incontestable registration for (1) its "dried fig spread" under the mark "DALMATIA" (Reg. No. 2,918,383 dated January 18, 2005); and (2) for the jar configuration in which the product is sold (Reg. No. 3,667,176 dated August 11, 2009).  *Magee Decl.* ¶ 7; Doc. No. 1-102; Doc. No. 1-103.

11.     Because of the success of its fig spread, Dalmatia sought to expand production and distribution of the product.  *Magee Decl.* ¶ 9.  Dalmatia selected FoodMatch as its exclusive distributor in the United States.  *Id.*

12.     Foodmatch is a distributor specializing in Mediterranean food items.

13.     On December 22, 2006, Dalmatia and FoodMatch entered into a Distribution Agreement.  *Id*; Doc. No. 1-104 ("Distribution Agreement").

14.     The Distribution Agreement, in paragraph 7(b), grants FoodMatch "a limited, revocable license within the [United States] during the term of this Agreement for ancillary use of the [DALMATIA Marks] as pre-approved by Dalmatia in writing in connection with any sales, marketing, distribution activities of FoodMatch with respect to the Products."  Distribution Agreement at 5 ¶ 7(b).  FoodMatch, in turn, agreed not to "perform any act which would be inconsistent with any of Dalmatia's Marks or Intellectual Property or Dalmatia's ownership thereof."  Distribution Agreement at 5 ¶ 7(c).

15.     Pursuant to the Distribution Agreement, FoodMatch purchased Dalmatia fig spread from Dalmatia and sold it to retailers and sub-distributors throughout the United States. *Magee Decl.* ¶ 10.

16.     Lancaster is Dalmatia's exclusive fig spread manufacturer in the United States. Doc. No. 1-47 at ¶ 5 ("*Second Magee Decl.*"); Doc. No. 1-70 at ¶ 17 ("*Thompson Decl.*"). Through a contractual arrangement, Lancaster manufactured Dalmatia's fig spread for more than seven years, from September 2008 through November 2015.  *Second Magee Decl.* ¶ 5.  In order to complete its obligations under the terms of the manufacturing arrangement, Lancaster has possession and knowledge of Dalmatia's proprietary recipes and manufacturing processes – information it was obligated to keep confidential and to use only for Dalmatia's benefit.  *Id.*

17.     Around the same time Dalmatia entered into the Distribution Agreement with FoodMatch, Dalmatia contracted with Lancaster to manufacture, package, and label its Dalmatia fig spread using the DALMATIA trademarks and according to Dalmatia's quality standards. *Magee Decl*. ¶ 11. Thereafter, at all relevant times up until about November 9, 2015, Lancaster was the exclusive manufacturer of 8.5-ounce jars of Dalmatia Original fig spread. *Id*. Dalmatia supplied Lancaster with its jars and labels. *Magee Decl.* ¶ 17; Doc. No. 1-42 ¶ 6 ("*Sanlley Decl.*").

18.     After Lancaster manufactured, packaged, and labelled Dalmatia's product, it sold the product to Dalmatia, and Dalmatia then sold the product to FoodMatch for nationwide distribution. *Magee Decl*. ¶ 12; *Sanlley Decl.* ¶ 7.

19.     Dalmatia continuously ensured that the Dalmatia products which Lancaster manufactured, packaged and labeled met Dalmatia's quality standards. *Magee Decl*. ¶ 13. Lancaster sent product samples to Dalmatia for Dalmatia's review and approval. *Id*. Additionally, Dalmatia team members would regularly purchase Dalmatia fig spread from various stores around the country and sample those products to assess quality. *Id*. If a product sample did not conform to Dalmatia's standards, Dalmatia objected to Lancaster and the issues were addressed. *Id*.

20.     Beginning in April 2015, Dalmatia learned of significant quality issues with the fig spread manufactured by Lancaster. *Magee Decl*. ¶ 14. These quality issues included the presence of inedible fig stems in the product, pieces of fig that were not fully cooked, fluctuations in sweetness and acidity levels, and problems with viscosity. *Id*. Dalmatia also received a consumer complaint of a rock in a jar of Dalmatia fig spread. *Id.*

21.     In response to the known quality issues, Dalmatia instructed Lancaster to send samples from each production batch for Dalmatia's review and approval before the batches could be released.  *Id.* ¶ 15; (Doc. No. 1-105).

22.     From April through September 2015, Dalmatia tested representative production samples sent by Lancaster after each production run.  *Id.* ¶ 16.  Dalmatia approved some production batches and rejected others.  *Id*.  When product samples did not meet Dalmatia's standards, Dalmatia informed Lancaster of the specific issues that needed to be addressed, such as product separation or "weeping," unacceptable hardness of fig pieces, and problems with viscosity.  *Id.* ¶ 16.

23.     In early November 2015, Dalmatia tested samples of fig spread that Lancaster had manufactured on October 26 and 27, 2015, and found that those product samples did not meet Dalmatia's quality standards.  *Id.* ¶ 17.

24.     Dalmatia immediately notified Lancaster that it rejected all product batches dated October 26 and 27 and instructed Lancaster to halt all manufacturing of fig spread.  Magee Decl. ¶ 17; *Sanlley Decl.* ¶ 5; Doc. No. 1-76 ¶ 46 ("*Thompson Decl.*").  Dalmatia also demanded that Lancaster return the labels and tags for Dalmatia fig spread.  *Sanlley Decl.* ¶ 6; *Magee Decl.* ¶ 17.

25.     The last production batches approved by Dalmatia were manufactured by Lancaster on October 23, 2015.  *Magee Decl.* ¶ 17; *Sanlley Decl.* ¶¶ 8-9.  The last shipment from Lancaster containing any fig spread approved by Dalmatia was on November 3, 2015.  *Sanlley Decl.* ¶ 8; Doc. No. 1-106 (Bill of Lading dated 11/3/15).

26.     In response to Dalmatia's rejection of all production batches from October 26 and 27, 2015 and instruction to halt production, Lancaster wrote to Dalmatia on November 9, stating

that it had "3.5 truckloads of [Dalmatia] product ready for immediate shipment," which had been produced on October 26, 27, 28 and 29 to fulfill three open purchase orders and requested payment and shipping instructions for those products.    *Magee Decl*. ¶ 18; Doc. No. 1-107. Lancaster also stated that it would not fulfill five other open purchase orders unless Dalmatia reconfirmed those orders.  *Magee Decl*. ¶ 18.

27.    Dalmatia continued its objection to the October 26 and 27 production batches because they failed to meet Dalmatia's quality standards, refused to confirm the other five purchase orders and stated that Lancaster had "no right to deliberately disregard [Dalmatia's] quality control instructions" and must "cease production of any other product, as you have been advised, since [Lancaster] refuses to adhere to Dalmatia's quality control standards."  *Magee Decl*. ¶ 19; (Doc. No. 1-108).   Dalmatia also reiterated its demand that Lancaster return the means by which Lancaster produced Dalmatia fig spread, including all jars and labels.  *Id*.[3]

28.    In early November, FoodMatch personnel saw "truckloads" of Dalmatia fig spread at Lancaster's facility in Pennsylvania.  *Sanlley Decl*. ¶ 10; (Doc. No. 1-110).  FoodMatch requested Dalmatia to authorize Lancaster to release those products to FoodMatch.  *Id*.  Dalmatia responded that those products had not been approved by quality control and that FoodMatch could not pick up those products for distribution.  *Id*.

29.    On November 9, 2015, Dalmatia informed FoodMatch that Dalmatia was moving production of its fig spread from Lancaster to a facility in Croatia due to "quality control issues that proved to be irremediable."  *Magee Decl*. ¶ 20; (Doc. No. 1-111).  In response, FoodMatch acknowledged that Dalmatia had rejected the "truckloads" of Dalmatia fig spread at the Lancaster facility because of quality issues, but renewed its request that Dalmatia nevertheless

---

[3] Lancaster responded on November 13, 2015, by filing a lawsuit against Dalmatia and Ms. Magee seeking damages for, among other things, Dalmatia's withdrawal of purchase orders.  (Civil Action No. 16-182 Doc. No. 1-1).

allow Lancaster to release those products to FoodMatch for sale.  *Magee Decl.* ¶ 21; (Doc. No. 1-112).

30.     Dalmatia responded to FoodMatch on November 19, 2015, stating that Dalmatia "would not stand for sub-standard product being released under [the DALMATIA] brand" and that Lancaster was "incapable of maintaining quality and safety standards."  *Magee Decl.* ¶ 22; (Doc. No. 1-113).  In that same correspondence Dalmatia also stated that fig spread was being rush-shipped from the Croatia facility at great expense to Dalmatia to meet FoodMatch's needs, but that Dalmatia could not allow the sale of the truckloads of Lancaster's substandard Dalmatia products.  *Id*.

31.     Despite Dalmatia's rejection of all batches of fig spread produced by Lancaster on October 26 and 27 due to quality issues, Lancaster nevertheless sold those products to FoodMatch.  *Magee Decl.* ¶ 23.  Lancaster, apparently, also sold to FoodMatch Dalmatia fig spread that had been manufactured by Lancaster on October 28, 2015, five days after the last batch that was approved for sale by Dalmatia.  *Magee Decl.* ¶ 17; *Sanlley Decl.* ¶¶ 8-9; Doc. No. 13 at ¶¶ 3-6 ("*Strunk Decl.*"); Doc. No. 14 at ¶¶ 2-3 ("*Ronnie Nadel Decl.*").

32.     Additionally, after Dalmatia instructed Lancaster to stop production, Lancaster continued to manufacture fig spread bearing the DALMATIA trademarks.  (Doc. No. 1-77 at 11).  Lancaster sold at least some of that fig spread to FoodMatch.  *Meldrum Decl.* ¶ 53. FoodMatch, in turn, sold it to sub-distributors and retailers.

33.     Lancaster has admitted that it sold Dalmatia fig spread directly to FoodMatch.  In his declaration submitted in opposition to Dalmatia's motion for preliminary injunction, Thompson declared:  "Lancaster caused approximately six truckloads of Dalmatia fig jam to be sold to FoodMatch in November and December 2015."  *Thompson Decl.* ¶ 53.

34.     Likewise, Meldrum admitted:  "FoodMatch received six truckloads of Dalmatia fig spread products from Lancaster in November and December."     *Meldrum Decl*. ¶ 8. Meldrum further admitted that Foodmatch sold the Dalmatia product to retailers and distributors. *Meldrum Decl*. ¶¶ 3-4, 7-8.  Dalmatia had no knowledge that Lancaster and FoodMatch sold and distributed Dalmatia fig spread without Dalmatia's authorization.  *Magee Decl*. ¶ 23.

35.     The jars of fig spread manufactured and sold by Lancaster and FoodMatch without Dalmatia's approval are packaged in Dalmatia's trademark jar configuration and labeled with the DALMATIA mark.  *See Ronnie Nadel Decl*. at 2; *Strunk Decl. Ex. A & B*.  They are identical in appearance to genuine Dalmatia fig spread.

36.     The rejected and unauthorized jars of Dalmatia fig spread that were sold by Lancaster to FoodMatch, and by FoodMatch to retailers and distributors, and that purport to be genuine Dalmatia fig spread are currently being sold by retailers across the United States. During the week prior to Dalmatia's submission of its supplemental brief, the unauthorized jars—that is, jars of Dalmatia fig spread manufactured by Lancaster bearing "best by" dates after October 23, 2018 (three years after the date of manufacture), were located in every region of the United States.  Jars were located in Alabama, California, Colorado, Connecticut, Michigan, Missouri, New Hampshire, New Jersey, and Washington.[4]

---

[4] Doc. No. 11 at  ¶¶ 4-5 ("*Flemming Decl.*") ("best by" date of October 26, 2018; located at Publix in Vestavia Hills, Alabama); Doc. No. 12 at ¶¶ 3-5 ("*Chupin Decl.*") ("best by" dates of October 26, 2018, October 27, 2016, November 13, 2016, and November 16, 2016 located in grocery stores throughout the Los Angeles, California area); Doc. No. 13 at ¶¶ 3-6 ("*Strunk Decl.*") ("best by" dates of October 27, 2018 and October 28, 2016 located in grocery stores throughout Denver and Boulder, Colorado); *Ronnie Nadel Dec.* ¶¶ 2-3 ("best by" date of October 28, 2018 located at ShopRite in Enfield, Connecticut); Doc. No. 15 at ¶¶ 4-5 ("*Benear Decl.*") ("best by" date of October 26, 2018 located at D&W Fresh Market in Williamston, Michigan); Doc. No. 16 at ¶¶ 4-5 ("*Boschert Decl.*") ("best by" date of November 13, 2018 located at Schnuck's in Creve Coeur, Missouri; Doc. No. 17 at ¶ 5 ("*Third Magee Decl.*") ("best by" date of October 27, 2018 located at Price Chopper in Keene, New Hampshire); Doc. No. 18 at ¶ 3 ("*Blaettler Decl.*") ("best by" date of October 27, 2018 located at King's Supermarket in Bedminster, New Jersey); Doc. No. 19 at ¶¶ 4-5 ("*Smith Decl.*") ("best by" date of November 13, 2018

37.     Likewise, Dalmatia's efforts to identify counterfeit product also uncovered that retailers are also selling jars of purported DALMATIA fig spread with no "best by" dates at all. *Sanlley Decl*. ¶ 19; (Doc. No. 1-40 at ¶ 6) ("*Stevens Decl*."). The lack of "best by" dates does not allow for a determination as to when those jars were produced, but Dalmatia never approved the sale of fig spread that lacked a "best by" date or production codes. *Magee Decl*. ¶ 24.

38.     The evidence supports a finding that Lancaster manufactured counterfeit product purporting to be DALMATA fig spread.  Lancaster then sold the counterfeit product to FoodMatch for resale to retailers and subdistributors.

39.     Dalmatia never received any invoice from Lancaster for the counterfeit DALMATIA product and never paid for those products. *Sanlley Decl*. ¶ 12. Likewise, Dalmatia never invoiced or received payment from FoodMatch for sale of the counterfeit products. *Id*.

40.     Dalmatia spent almost twenty years cultivating the reputation associated with its DALMATIA fig spread. *Magee Decl*. ¶ 27. Lancaster and FoodMatch have engaged in activities to destroy Dalmatia's reputation in an effort to sell their competitive Divina fig spread to buyers who are dissatisfied with the inferior counterfeit DALMATIA product. *Magee Decl*. ¶ 26.

41.     FoodMatch previously described Dalmatia's product on its website as "the most popular fig spread on the market." *Magee Decl*. ¶ 26; (Doc. No. 1-115).  By manufacturing and selling inferior, unauthorized products, Lancaster and FoodMatch sought to destroy the goodwill associated with Dalmatia's brand and product.

---

located at Fred Meyer in Camas, Washington). In each of the above-referenced instances where there was identification of counterfeit DALMATIA product, the production date can be ascertained by the bear lot codes using Lancaster's Julian date system.  For example, production batches manufactured on October 27, 2015, are coded in part "5300-DI" with the "5" standing for the year 2015 and "300" referring to the 300th day of the year (October 27). *Sanlley Decl.* ¶ 9.  Alternatively, the production date can be determined because Lancaster's coding system assigns a "best by" date on the jar that matches is exactly three years after the production date. *Id*.

## V.    CONCLUSIONS OF LAW

### A.    <u>Choice of Law</u>

42.    Dalmatia's claims for trademark infringement and trademark counterfeiting under the Lanham Act was brought in the Southern District of New York, in the Second Circuit, under that court's federal question jurisdiction.   Subsequently, the case was transferred to this court, in the Third Circuit, by agreement of all the parties pursuant 28 U.S.C. § 1404(a).   The court must first determine what law governs this motion.

43.    As to issues governed by federal law, Eastern District of Pennsylvania courts have held that following transfer, they will apply Third Circuit law, though they "will give 'close consideration' to the law of the . . . the transferor circuit, as appropriate." *In re Ikon Office Solutions, Inc. Securities Litig.*, 86 F. Supp. 2d 481, 484 (E.D. Pa. 2000).   This is consistent with the principle that except where Congress has declared otherwise, there is one set of federal law, not thirteen different sets.   As the Second Circuit explained, "federal law… is assumed to be nationally uniform, whether or not it is in fact. *Menowitz v. Brown*, 991 F.2d 36, 40 (2nd Cir. 1993) (citing *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1065 n.19 (3d Cir. 1976)).

44.    The Third Circuit has not addressed this issue.   Other circuits, however, have held that following transfer, the transferree court follows the law of its own regional circuit. *Menowitz*, 991 F.2d at 40 (holding that the "transferee court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit"); *Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998) ("this court cannot and does not apply the law of another circuit simply because the case was transferred from the other circuit"); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171 n.4 (8th Cir. 1998); *Newton v. Thomason*, 22 F.3d

1455 (9th Cir. 1994) ("a transferee court in this circuit is bound only by our circuit's precedent"); *Murphy v. F.D.I.C.*, 208 F.3d 959, 965 (11th 2000); *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987) (holding that when dealing with a federal question the law of the transferor circuit "does not have stare decisis effect in a transferee forum situated in another circuit."). There are instances in which courts of appeals have applied the transferror circuits, but only when applying Congress specifically recognized that federal law was geographically non-uniform. *See In re Ford Motor Co.*, 591 F.3d 413 n.15 (5th Cir. 2009); *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1545 (10th Cir. 1996). That is not the case here.

45.     The court concludes that on issues governed by federal law, it must follow the law of the Third Circuit, although it will give close consideration to the law of the Second Circuit.

### B.     Mootness

46.     Dalmatia's requested preliminary injunction includes three main components. First, Dalmatia seeks an order requiring FoodMatch and Lancaster to recall from wholesalers and retailers the counterfeit product they have sold, with a specified notice informing purchasers of the reason for the recall. Second, Dalmatia seeks an order enjoining FoodMatch and Lancaster from further trademark infringement and counterfeiting. Third, Dalmatia seeks seizure from FoodMatch and Lancaster of all goods bearing Dalmatia's trademarks.

47.     Dalmatia filed its motion for preliminary injunction on March 25, 2016. A significant amount of time has elapsed. As a threshold matter, the court considers whether the requested relief is moot. The Court concludes that the requested relief is not moot.

48.     As to the requested recall, Dalmatia has established that the counterfeit product remains on retail shelves across the United States, including in at least nine states in every region

of the country.   Therefore, Dalmatia's interest in having that product removed from the market remains a live issue.

49.     As to the remainder of the relief, FoodMatch and Lancaster both state that they do not intend to distribute any additional Dalmatia-marked products.  FoodMatch argues that it no longer possesses any Dalmatia-marked products to distribute.  Lancaster argues that it has agreed to release to Dalmatia all of the finished Dalmatia product, unused jars, and labels that it possesses.  However, neither Lancaster nor FoodMatch will permit an inspection of its facilities to verify that it has no more Dalmatia-marked product on hand.  Nor will either Lancaster or FoodMatch stipulate to an order restraining the sale of Dalmatia-marked products.  Their refusal to do so, given their representations that they do not intend to engage in the conduct that would be restrained, undermines their position.  FoodMatch's and Lancaster's representations are not enforceable through the court's contempt powers in the way an injunction would be.  Consequently, Dalmatia's requests are not moot.

**C.     Standard for Preliminary Injunction**

50.     A plaintiff seeking a preliminary injunction has the burden of establishing: (1) likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that a grant of injunctive relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

**D.     Irreparable Harm**

51.     The court begins by considering the irreparable harm prong of the test.  Courts have traditionally held that trademark infringement amounts to irreparable injury as a matter of law.  *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992).   In *Kos*

*Pharmaceuticals, Inc. v. Andrx Corp.*, the Third Circuit reversed the denial of a preliminary

injunction in a trademark case, holding:

> "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).   Lack of control over one's mark   "creates the potential for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990).   Thus, "trademark infringement amounts to irreparable injury as a matter of law." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992); *see also Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir. 2000) ("potential damage to . . . reputation or goodwill or likely confusion between parties' marks" is irreparable injury).   "Once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan*, 143 F.3d at 805.
>
> The district court's erroneous holding that Kos had not proven that it was likely to succeed on its trademark claims deprived Kos of the benefit of this rule. As we have already found that Kos has shown a likelihood of success, we hold it is entitled to a presumption that it will suffer irreparable harm absent an injunction.

369 F.3d 700, 726 (3d Cir. 2004); *see also Dunkin Donuts Franchise Rests., LLC v. Claudia I,

LLC*, No. 12-2010, 2013 U.S. Dist. LEXIS 70025, at *13 (E.D. Pa. May 17, 2013); *Cottman

Transmissions Sys., LLC v. Gano*, No. 12-5223, 2013 U.S. Dist. LEXIS 31195, at *15 (E.D. Pa.

Mar. 7, 2013); *Alliance Bank v. New Century Bank*, 742 F. Supp. 2d 532, 565-66 (E.D. Pa.

2010).  In *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 217 (3d

Cir. 2014), the Third Circuit held that Lanham Act plaintiffs are no longer entitled to a

presumption of irreparable harm.   Nevertheless, after *Ferring*, courts in the Third Circuit

continue to apply the same considerations—lack of control over one's mark, loss of trade, loss of

good will—which leads inexorably to the same results.  *See, e.g., United States Soo Bahk Do

Moo Muk Kwan Federation v. Tang Soo Karate School*, No. 12-669, 2015 U.S. Dist. LEXIS

107955, at *78-*80 (M.D. Pa. Aug. 17, 2015) ("Trademark infringement need not automatically

result in a finding of irreparable injury when the infringement claim relies on an assertion of

14

actual damages.  But the situation is different, when, as here, the infringement claim asserts a likelihood of confusion.   Once the likelihood of confusion caused by trademark has been established, the inescapable conclusion is that there was also irreparable injury.") (internal quotation marks omitted); *see also Fruit Flowers, LLC v. Jammala, LLC*, No. 14-5834, 2015 U.S. Dist. LEXIS 130748, at *14 (D.N.J. Sept. 29, 2015) ("According to Plaintiff, Defendants continue to infringe the Fruit Flowers Marks by using them on website advertisements and in their New Jersey store without Fruit Flowers' consent, resulting in consumer confusion and deception.  This is sufficient to establish irreparable injury.")

52.     FoodMatch and Lancaster have usurped Dalmatia's control of its marks.  Product is currently on retail shelves across the country that consumers will purchase believing it is Dalmatia-authorized product when in fact it is not.  The loss of control of one's brand cannot be adequately compensated through money damages.   That is quintessential irreparable harm. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990); *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d. Cir. 1986) ("A trademark licensor has a particular interest in controlling the use of its mark by its licensees in order to preserve the mark's quality and its continued vitality.  … And, it is that loss of control which is the very thing that constitutes irreparable harm in the licensing context.'"); *Byron Lars v. San Siro, Inc.*, No. 96-9499, 1997 U.S. Dist. LEXIS 9398, at *26-27 (S.D.N.Y. May 19, 2007) ("By selling goods bearing the Mark, despite the fact that Mr. Lars did not approve the goods, Defendant misleads ordinary consumers into believing that the merchandise constitutes genuine Byron Lars garments which were authorized by Byron Lars thereby resulting in irreparable injury.")

53.     The court has carefully considered Lancaster's arguments that Dalmatia cannot satisfy the irreparable harm prong.     The court concludes that Lancaster's arguments are unavailing.

54.     Lancaster first cites *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003).  *Wisdom Import* has not a trademark case and is not applicable to the instant case, except in its recitation of the law of irreparable harm generally.  It states that irreparable harm must be "certain and imminent for a which a monetary award does not adequately compensate."    *Id.* at 113-14.  That describes the harm in the instant case, in which infringing product is presently on the shelves such that Dalmatia has lost control of its brand. Moreover, it is worth noting that the *Wisdom Import* court found that the irreparable harm prong was satisfied and affirmed the entry of a preliminary injunction.[5]

55.     Lancaster next cites *DeShawn E. by Charlotte E. v. Safir*, 156 F. 340 (2d Cir. 1988) for the proposition that "a past injury is insufficient to establish irreparable harm."  *Opp.* at 17.  The citation is curious because *DeShawn E.* (i) is not a trademark case, (ii) is not a preliminary injunction case, (iii) and does not address the irreparable harm requirement at all.  In any event, Dalmatia is not relying on the injury it has suffered in the past; its motion is directed toward the harm it will suffer as a result of the counterfeit product presently on the shelves, as well as the risk of harm from the additional materials in the possession of Lancaster and FoodMatch.

56.     Lancaster also cites *Merit Capitol Group, LLC v. Trio Indus. Mgmt, LLC*, No. 04-7690, 2005 U.S. Dist. LEXIS 322 (S.D.N.Y. Jan. 7, 2005).  *Merit Capitol* is also not a trademark case.  It involves a dispute over a financial transaction.  The court found: "It is apparent even

---

[5] Perhaps more relevant to the other pending preliminary injunction motion, *Wisdom Import* held that denial of a bargained-for contractual right, standing alone, may constitute irreparable harm for purposes of obtaining a preliminary injunction.  *Id.* at 114.

from Plaintiff's complaint, which primarily seeks monetary relief in the form of repayment of Defendants' purported debt, that any potential harm in this action is readily quantifiable and compensable with monetary damages at the conclusion of this action." *Id.* at *6.   As the Third Circuit cases cited above make clear, trademark infringement cases are different.   The loss of control of intellectual property, including one's brand, is not compensable with monetary damages.

57.   Lancaster's citation to *Kamerling v. Massanari*, 295 F.3d 206 (2d Cir. 2002), is similarly unpersuasive.  *Kamerling* also is not a trademark case.  It states the general rule that irreparable harm must be "continuing." *Id.* at 214.  Here, the harm is continuing.  Lancaster argues:  "Dalmatia's only claim of harm attributable to Lancaster stems from a past act – the alleged sale of Dalmatia product to FoodMatch." *Opp.* at 17.  Lancaster's own citations show, however, that it is the irreparable harm that must be continuing, not the misconduct.  Lancaster may be correct that the counterfeiting activity committed by Lancaster is in the past (November and December 2015), but the irreparable harm Dalmatia is suffering will continue, absent the recall portion of the injunction, because the counterfeit product remains on the market.

58.   Lancaster argues that it "has offered to return the Dalmatia property and product in its possession and has agreed to not ship any Dalmatia product prior to reaching an agreement with Dalmatia about its disposition.  Dalmatia did not accept this offer. This speaks volumes." *Opp.* at 18.  The court, however, reaches a different conclusion.  The court understands that Dalmatia would have accepted an offer if it were verifiable—that is, if Dalmatia could inspect Lancaster's facility to determine that Lancaster has returned all the product and Dalmatia trademark material that is there—and enforceable—that is, if the agreement were part of a stipulation and order such that a violation could be remedied through the court's contempt

17

powers.   Lancaster would not agree to such an arrangement.   The court concludes that Lancaster's unwillingness to permit an inspection underscores the need for the inspection Dalmatia sought in its motion.   The court furter concludes that Lancaster's unwillingness to stipulate in a consent order that it will not engage in further trademark counterfeiting underscores the need to put a court order in place.

59.     Lancaster also argues that it "is incapable of effectuating a recall or the return of the property, as is sought by Dalmatia, since it has been distributed by FoodMatch to customers and channels unknown to Lancaster."  *Opp.* at 18.  The court will not order Lancaster to do the impossible.  Lancaster can only recall the counterfeiting product from the customers it knows about, which may only be FoodMatch.   But Lancaster can certainly recall the product from FoodMatch.

60.     For FoodMatch's part, the affidavit executed by Meldrum does not address the issue of irreparable harm.

61.     The harm to Dalmatia is irreparable and ongoing and will continue absent the requested preliminary injunction.

### E.     Likelihood of Success on the Merits

62.     Dalmatia's motion implicates its claims for trademark infringement and trademark counterfeiting, both of which arise under the Lanham Act.

63.     The court turns first to Dalmatia's claim for trademark infringement.  "To prevail on a claim for trademark infringement under the Lanham Act, the owner of a valid and legally protectable mark . . . must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'"  *Kos Pharms.*, 369 F.3d at 708-09.  The court concludes that Dalmatia will likely satisfy that standard.

64.     Dalmatia is the owner of (1) an incontestable registration for the DALMATIA mark for use with "dried fig spread"; and (2) the jar configuration in which the product is sold. FoodMatch and Lancaster do not dispute that these marks are valid and legally protectable.  The court concludes that they are.

65.     Likelihood of confusion is normally analyzed by the ten factor test set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).  "However, a detailed analysis of [those] factors is not necessary in cases regarding counterfeit merchandise, which by its nature cases confusion."  *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 169 (S.D.N.Y. 2007). The Third Circuit holds that, as a matter of law, there is a great likelihood of confusion when a trademark is used concurrently by two parties, as occurred in this case.  *S&R Corp. v. Jiffy Lube Int'l*, 968 F.2d 371, 375 (3d Cir. 1992); *see also Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) ("Thus, likelihood of confusion is inevitable, when, as in this case, the identical mark is used concurrently by unrelated entities.").  Neither FoodMatch nor Lancaster challenge Dalmatia's success at proving likelihood of confusion.

66.     Accordingly, the court concludes that Dalmatia is the owner of valid and legally protectable marks and that FoodMatch's and Lancaster's use of similar marks for its goods causes a likelihood of confusion.

67.     The court next turns to Dalmatia's counterfeiting claim.  "The only material distinction between the standard for federal trademark counterfeiting and the standard for showing trademark infringement is that in order to obtain treble or statutory damages for a counterfeiting claim, as discussed in greater detail below, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing it was a counterfeit."  *Louis*

*Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567,  581 (E.D. Pa. 2002).  The court concludes that Dalmatia is likely to succeed in providing that additional element.

68.     Lancaster intentionally used Dalmatia's marks knowing it was not authorized to do so.  Indeed, Lancaster admitted that.  Thompson admitted in his declaration that Lancaster shipped six truckloads of Dalmatia fig spread to be sold to FoodMatch—not to Dalmatia, as was the parties' exclusive practice—in November and December 2015.  Meldrum admitted that FoodMatch purchased this product from Lancaster—not from Dalmatia, as was the parties' exclusive practice.  That product was not Dalmatia-authorized product, and the means of its sale leads the court to conclude that both Lancaster and FoodMatch knew it.

69.     The court has carefully considered the opposing arguments offered by Lancaster and FoodMatch and finds those arguments unpersusaive.

70.     Lancaster argues in its opposition brief that it took the actions it did "to mitigate its damages" and because of "an expectation in the market that Lancaster-produced fig jam would be available to the retail trade."  *Opp.* at 11.  Those rationales do not avoid a violation of the Lanham Act.  Nor does it matter to the likelihood of success analysis whether the unauthorized products met Dalmatia's specifications or quality control standard.  Such issues might be relevant to damages at trial, but not to liability, and not to Dalmatia's ability to control its trademarks.  Lancaster and FoodMatch violated federal trademark and counterfeiting law.

71.     In opposing Dalmatia's motion, Meldrum of FoodMatch argues in his affidavit:

> Dalmatia's application only complains about goods manufactured on October 26 and 27, and November 13 and 16, 2015.  It does not explain how those goods were manufactured any differently than the goods manufactured and released in the days, weeks, or months prior to that time.  As far as FoodMatch knew, all such goods were manufactured by Lancaster as the authorized manufacturer … to fill orders placed by FoodMatch, and they met all specifications and were conforming goods.

> Indeed, the alleged basis for plaintiff's motion is that the goods are "counterfeit" because they allegedly do not meet the specifications. Dalmatia does not allege in its papers how the goods are non-conforming in any way.

*Meldrum Decl.* ¶¶ 3-4. For purposes of liability under the Lanham Act, however, it makes no difference whether the unauthorized products "met specifications" or were "conforming goods." And for trademark infringement, which is a strict liability offense, it makes no difference whether FoodMatch believed that the "goods were manufactured by Lancaster as an authorized manufacturer." It matters only that the products were not in fact authorized by Dalmatia for manufacture and/or sale—a fact that neither party challenges. Lancaster admitted it lacked Dalmatia's approval, and FoodMatch admitted that it purchased the unauthorized products and resold them. The court will rely on Lancaster's and FoodMatch's admissions, which compel the conclusion that Dalmatia has met its burden.

72. Lancaster's defense on the merits appears to be that trademark law does not reach the unauthorized sale or manufacture of goods absent quality issues. If that were so, any manufacturer could make a product and sell it under someone else's mark, and as long as the product were made sufficiently well, there would be no violation of the Lanham Act. The cases cited by Lancaster do not so hold, and they have no application here. *See Opp.* at 15-17. In those cases, the plaintiff challenged the sale of goods that it had authorized for both manufacture and sale, only outside of the United States or in a narrow trade channel. For example, *Zino Davidoff* affirmed a preliminary injunction prohibiting CVS from selling grey market bottles of Davidoff's perfume which the trademark holder intended for sale outside of the United States. *Zino v. Davidoff SA v. CVS Corp.*, 571 F.3d 238, 241-42 (2d Cir. 2009). The goods at issue were authorized for manufacture and sale by the trademark holder—just not in the United States. In contrast, the product at issue in the instant case was never authorized for sale.

73. *TechnoMarine SA v. Jacobs Times, Inc.*, 905 F. Supp. 2d 482 (S.D.N.Y. 2012), is also no help to Lancaster.  In that case (another grey market goods case, unlike this one), the court "assum[ed]—without deciding—that plaintiff is correct that goods produced outside of an authorized production would be 'counterfeit.'"  *Id.* at 490.  That is precisely what is at issue here: product produced outside of an authorized production.

74. *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58 (2d Cir. 1992), is also inapplicable.  There, the defendant distributor purchased the trademark owner's contact-lens solution kits that were intended to be sold only to medical professionals and broke down those kits and sold the individual components to retailers.  *Id.* at 60-61.  Thus, like in *Zino v. Davidoff*, the goods had been authorized for manufacture and sale—just not in the retail channel and not as individual components.

75. Here, in contrast, Dalmatia did not authorize the manufacture or sale of the product implicated by Dalmatia's motion.  Indeed, Lancaster admits that Dalmatia expressly forbade Lancaster from manufacturing and selling Dalmatia fig spread after November 11, 2015.  *Opp.* at 9; *Thompson Dec.* ¶ 46 & Exhibit T.  But Lancaster proceeded to manufacture fig spread bearing Dalmatia's marks after November 11 (on November 13 and 16) and sold that product to FoodMatch, which in turn sold it to sub-distributor and retailers, all without Dalmatia's knowledge.  Also, although Lancaster claims there is no "written record" of Dalmatia rejecting the fig spread that was made on October 26 and 27 (*Opp.* at 7), a careful reading of Lancaster's brief and Thompson's declaration reveals that Lancaster does not dispute that Dalmatia did in fact reject those production batches.

76. The court in *Ryan v. Volpone Stamp Co.* explained:

> [A] court faced with an infringement claim for unauthorized sales of a
> trademarked product must perform a two-party analysis.  First, the court must

consider whether the trademark owner authorized the first sale of goods.  Second, the court must consider whether the goods were genuine.  If the initial sale was authorized, the court must undertake the second part of the analysis and determine whether, as a matter of fact, the goods which were later resold without authorization were genuine. … *If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.*

107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000) (emphasis added); *see also Microban Prods. Co. v. API Indus.*, No. 14-41, 2014 U.S. Dist. LEXIS 63883, at *29 (S.D.N.Y. May 8, 2014) (licensee's unauthorized use of licensor's marks constituted counterfeiting under 15 U.S.C. § 1116(d) as a matter of law); *Murjani Int'l v. Sun Apparel, Inc.*, No. 87-4628, 1987 U.S. Dist. LEXIS 6942, at *29-*30 (S.D.N.Y. July 31, 1987) ("Any distribution of products by the defendants which bear the 'COKE' or 'COCA-COLA' marks, after the termination of the agreements, would engender the false impression that Coca-Cola is the manufacturer of these products and would thereby constitute a trademark infringement.").  As the Third Circuit held in *S&R*, continued use of a trademark after such use ceases to be authorized is trademark infringement.  *S&R*, 968 F.3d at 375-77.

77.    Lancaster's assertion that the fig spread it sold under Dalmatia's trademarks is "genuine" because it met "objective quality standards" (*Opp.* at 7, 15) is incorrect.  Also incorrect is Lancaster's assertion that "Dalmatia cannot satisfy its burden that Lancaster in any way deviated from the defined and objective quality control standards constituting the requisite 'interference' to sustain a trademark infringement claims."  *Opp.* at 15.  Dalmatia has no such burden.  The fig spread that Lancaster sold to FoodMatch and that FoodMatch sold to retailers is not "genuine," regardless of objective quality standards, because its manufacture (in the case of the batches produced on November 13 and 16) and its sale (in the case of the batches produced on October 26, 27, 28 and November 13 and 16) was not only unauthorized, it was expressly forbidden.

78.     Lancaster argues regarding Dalmatia's allegedly "fluid, ever changing subjective standards incapable of measurement or objective ascertainment."  *Opp.* at 15.  Whether Dalmatia was entitled to impose such standard (if it did) is not relevant, however, because the alleged business practices by Dalmatia are not a defense to a violation of the Lanham Act.  Regardless of whether Dalmatia was entitled as a matter of contract to deny authorization for Lancaster to manufacture and sell Dalmatia-marked fig spread, Dalmatia did so.  Lancaster manufactured and sold Dalmatia-marked fig spread anyway, and that was trademark infringement and counterfeiting.

79.     Although the argument does not appear in its opposition to Dalmatia's motion for a preliminary injunction, in a separately filed motion to dismiss Dalmatia's trademark claims, Lancaster appears to argue that it had the right to sell unauthorized fig spread under the Uniform Commercial Code §§ 2-703 and 2-706.  That argument was expressly rejected by *Burberry's, Ltd. v. After Six, Inc.*, 471 N.Y.S.2d 235 (1984).  As *Burberry's* explains, UCC § 2-703 provides that when a buyer wrongfully rejects goods, the aggrieved seller may resell the goods and recover damages as provided in in UCC § 2-706.  Lancaster has not established that Dalmatia's rejection of its goods was wrongful.  In any event, "Section 2-706 does not purport to grant a trademark license and a sale under the sanction of that section would be doing exactly that."  *Id.* at 563; *see also Ryan*, 107 F. Supp. 2d at 386.

80.     Also, notably, only the product manufactured by Lancaster in October was "rejected," wrongfully or otherwise, by Dalmatia.  The product manufactured by Lancaster in November was product whose manufacture was expressly prohibited by Dalmatia, so neither UCC § 2-706 nor the line of cases cited by Lancaster regarding previously authorized manufacture could apply to the product manufactured in November.

24

81.     In its reply brief in support of its motion to dismiss, Lancaster argues that Dalmatia cannot maintain a claim for trademark infringement because there had been no recission or termination of Lancaster's contractual right to use Dalmatia's trademarks.  The case on which Lancaster relies, however, involved an alleged trademark infringer whose use of the trademark at issue had been expressly authorized in its contract with the trademark owner.  *See Affiliated Hosp. Prods. v. Merdel Game Mfg. Co.,* 513 F.2d 1183 (2d Cir. 1975) ("Absent grounds for rescission, Merdel has had since March 2, 1970, the right to use the word Carom, and Affiliated has only the right to compensatory damages for breach of the agreement.").  Here, the evidence shows that Lancaster used Dalmatia's trademarks without authorization   A trademark licensee's unauthorized use of a trademark can be both a breach of contract and trademark infringement under the Lanham Act.  *Franchised Stores of N.Y., Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir. 1968) ("Moreover, we reject as unsound the contention that a trademark licensor cannot proceed against the licensee while the license agreement is still in effect."); *Sterling Drug Inc. v. Bayer AG,* 792 F.Supp. 1357, 1371 n. 12 (S.D.N.Y.1992) (noting that, "[w]hile the trademark laws could not provide a basis for relief unless there was a breach of contract," the plaintiff had established that defendants breached the parties' agreements and thus trademark law was applicable to claims of unauthorized use of the mark); *Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.*, 212 F. Supp. 715, 740 (E.D. Pa. 1962) (holding licensee infringed licensor's trademark by using it in breach of license agreement.).

82.     Lancaster appears to raise an unclean hands defense in connection with the irreparable harm prong of the injunction test, so the court will address unclean hands in that context.

83.     Without citation to authority, Lancaster bases its unclean hands on the assertion that "during 2015, Dalmatia repeatedly changed its product specifications and manufacturing processes, tinkering with a successful food item. Then, during the run-up to the 2015 Holiday Season, it terminated Lancaster (its manufacturer) and FoodMatch (its distributor), thereby causing additional turmoil and virtually guaranteeing losses." *Opp.* at 19.  Those allegations also do not state a proper unclean hands defense.

84.     For its part, FoodMatch's affidavit of Meldrum does not cite any authority or raise any cognizable defense.  FoodMatch assserts that Dalmatia "comes to this court with unclean hands."  *Meldrum Decl.* ¶ 9.  However, FoodMatch has also not alleged any facts that fit the defense.

85.     "The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation."  *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 174 (3d Cir. 2001).  Courts "do not close their doors when plaintiff's misconduct has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.  The nexus between the misconduct and the claim must be close."  *Id.* (citations and internal quotation marks omitted); *S&R*, 968 F.2d at 377 n.7 ("To prevail on an unclean hands defense, the defendant must show fraud, unconscionability, or bad faith on the part of the plaintiff").

86.     The court has not found any facts supporting a conclusion that Dalmatia committed any "unconscionable act," let alone one immediately related to the trademark infringement alleged here.  Certainly changing product specifications and manufacturing processes is not unconscionable or fraudulent.  Neither is terminating contracts (and the Court

notes that, as to Lancaster, nothing suggests the contract was ever terminated). Lancaster's unclean hands allegations are unrelated to Dalmatia's procurement of its trademarks or to Lancaster's deliberate infringement. Also, Lancaster's theory does not make sense: Dalmatia had the absolute right to switch manufacturers and to direct Lancaster to cease production; Lancaster has not claimed otherwise. There was no reason for Dalmatia to create a "pretext" for doing so.

87. For the reasons stated above, the court concludes that Dalmatia is likely to succeed on its claim for trademark infringement and its claim for trademark counterfeiting.

### E.      Balance of Hardships

88. The court concludes that the preliminary injunction requested by Dalmatia "will not result in even greater harm to the nonmoving part[ies]," FoodMatch and Lancaster. *Kos Pharms.*, 369 F.3d at 708. The only hardship that Defendants will suffer through the imposition of a preliminary injunction is to comply with the law. See *Gayle Martz, Inc. v. Sherpa Pet Group, LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009).

89. First, Dalmatia asks the Court to enjoin FoodMatch and Lancaster from future trademark infringement and counterfeiting.   FoodMatch states, through Mr. Meldrum's declaration, that it no longer possesses the infringing fig spread product. If that is accurate, ordering FoodMatch not to sell such product while the case proceeds to trial should have no harmful effect. For its part, Lancaster admits to possessing the infringing fig spread product and has offered to turn it over to Dalmatia, after which it says it will possess no more. Requiring Lancaster to do through an enforceable court order what it states that it will do voluntarily anyway does not harm Lancaster.

90.     Second, Dalmatia asks the court to permit inspections of the facilities of FoodMatch and Lancaster to ensure there is no more infringing product or material that would enable further infringement.  Essentially, Dalmatia seeks verification that the FoodMatch's and Lancaster's representations are accurate.  That cannot harm FoodMatch and Lancaster.

91.     Third, Dalmatia asks the court to order FoodMatch and Lancaster to recall the infringing product from their customers.  Lancaster states that FoodMatch was its only customer at issue; the recall will therefore work no harm on Lancaster.  As to FoodMatch, Meldrum's affidavit does not identify any harm that would result from a recall.  In any event, any harm to FoodMatch would be a result of FoodMatch's own infringing conduct.  As the Third Circuit held in *Novartis Consumer Health, Inc. v. J&J*, 290 F.3d 578, 596 (3d Cir. 2002), "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself."  FoodMatch had never before purchased product directly from Lancaster; it had always purchased product from Dalmatia.  FoodMatch chose to cut Dalmatia out of the loop; it knew what it was doing.  "By virtue of this recalcitrant behavior, [FoodMatch] can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself."  *Opticians*, 920 F.2d at 197.

92.     The Third Circuit recognizes that "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor."  *Kos*, 369 F.3d at 729.  Given that neither FoodMatch nor Lancaster have raised a cognizable defense to Dalmatia's trademark and counterfeiting claims, it is all the more clear that this factor weighs in favor of the requested relief.

F.      **Public Interest**

93.     "The final consideration in [the court's] analysis is whether the issuance of a preliminary injunction furthers the public interest." *Opticians*, 920 F.2d at 197.  "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused."  *Id.*

94.     "Having already established that there is a likelihood of consumer confusion created by the concurrent use of the [Dalmatia] marks, it follows that if such use continues, the public interest would be damaged.  Conversely, a prohibition upon [FoodMatch and Lancaster] use of the marks would eliminate that confusion."  *Id.*

95.     The public interest in the requested injunction here is especially clear given that this case is about food products that are currently on retail shelves.  Absent the requested preliminary injunction, people will purchase and put into their bodies food that that they believe was authorized by Dalmatia that in fact was not authorized.  Putting a stop to this confusion is certainly in the public interest.

96.     The affidavit of Meldrum of FoodMatch offers no argument on the public interest prong.

97.     Lancaster argues that "the public interest is not disserved by denial of the motion" because "this injunction arises in the context of a commercial matter between two private parties disputing the applicable terms of their agreement and the validity of Dalmatia's erratic changes to an otherwise successful product that met all objective quality control standards."  *Opp.* at 21.  The court is not persuaded.  First, trademark disputes are almost always between private parties.  Courts almost always find that public interest is served by enjoining trademark infringement.  Second, this case is not about applicable terms of the parties' agreement.  Neither Lancaster nor FoodMatch has asserted they were licensed to manufacture or sell unauthorized fig spread.  The

court need not interpret any agreement to reach its findings on that motion, and if it were, that would have no bearing on the public interest analysis.   Likewise, whether Dalmatia asked Lancaster to make production changes, and if so whether such changes were valid or erratic is not germane to any issue before the Court.

98.     The court concludes that the public interest would be served by the entry of the preliminary injunction requested by Dalmatia.

### **Bond**

99.     Pursuant to Federal Rule of Civil Procedure 65(c), the court may issue a preliminary injunction only if the movant gives security in any amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined.  The amount of the bond is left to the discretion of the court.  *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).

100.     "In fixing the amount of the security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative."   *AB Electrolux v. Mermil Indus.*, 481 F. Supp. 2d 325, 336-37 (S.D.N.Y. 2007).

101.     "Moreover, the burden is on the party seeking the security to establish a rational basis for the amount of the proposed bond."   *Id.*; *see also Volvo Group, N.A. v. Truck Enters.*, No. 16-25, 2016 U.S. Dist. LEXIS 50258, at *20-*21 (W.D. Va. Apr. 14, 2016) ("The party to be enjoined bears the burden of establishing the appropriate bond because he is in the best position to determine the harm he will suffer from a wrongful injunction."); *M-I LLC v. FPUSA*, No. 15-406, 2015 U.S. Dist. LEXIS 149160, at *43 (W.D. Tex. Nov. 4, 2015) ("The party against whom a preliminary injunction is sought bears the burden of establishing a rational basis for the amount of the proposed bond.").

102.    FoodMatch and Lancaster have not met their burdens with respect to the amount of the bond.  Neither submitted any evidence regarding the harm they would suffer if wrongfully enjoined.  In the Second Circuit, where this motion was originally pending, the failure of proof, combined with Dalmatia's high likelihood of success, would lead the court to require no bond. *See NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010). Because the Third Circuit applies the requirement of Rule 65(c) more strictly, the court concludes that the bond should be set at $50,000.

## V.    CONCLUSION

Having found the preliminary injunction factors satisfied, the court **GRANTS** Dalmatia's motion for a preliminary injunction against FoodMatch and Lancaster.  A separate order will follow.