IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALMATIA IMPORT GROUP, INC. and | : | |
| MAIA MAGEE, | : | |
| | : | CIVIL ACTION NO. 16-2767 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| FOODMATCH, INC., | : | |
| LANCASTER FINE FOODS, INC. | : | |
| EARTH PRIDE ORGANICS, LLC, and | : | |
| MICHAEL S. THOMPSON, | : | |
| | : | |
| Defendants. | : | |

---

## SECOND AMENDED COMPLAINT

Plaintiff Dalmatia Import Group, Inc.[1] ("Plaintiff" or "Dalmatia") brings this action against Defendants FoodMatch, Inc. ("FoodMatch"), Lancaster Fine Foods, Inc. ("Lancaster"), Earth Pride Organics, LLC ("Earth Pride"), and Michael S. Thompson ("Thompson") for injunctive relief and monetary damages, and on information and belief alleges as follows:

## NATURE OF THE ACTION

1.     Dalmatia's claims arise from Defendants' theft of Dalmatia's intellectual property for their own commercial advantage.  Defendant FoodMatch conspired with Defendants Lancaster and Michael S. Thompson to use Dalmatia's proprietary fruit spread recipes and production processes to launch a copycat line of fruit spreads under FoodMatch's Divina brand. In advance of FoodMatch's product launch, the Defendants conspired to suppress demand for Dalmatia's fig spread products by saturating the market with hundreds of thousands of jars of

---

[1] Maia Magee is named as a plaintiff as a result of the Court's order consolidating Civil Actions 16-2767 and 16-182 (Doc. 41).  Ms. Magee does not personally assert any claims against the defendants.

**counterfeit** fig spread products bearing the DALMATIA trademarks and trade dress without Dalmatia's knowledge or authorization. All of these actions breached FoodMatch's and Lancaster's respective contracts with Dalmatia. Dalmatia has brought this action to stop Defendants' unlawful use of its intellectual property and to recover its damages.

2. Plaintiff Dalmatia is a specialty food company that maintains a unique product line inspired by the agriculture and culture of Dalmatia – a district of Croatia on its Adriatic Coast. Dalmatia is the innovator of "fig spread," a food item that has received widespread success and acclaim from consumers, and won numerous industry awards. Based on more than 15 years of dedicated effort building its brand, expanding its product line and promoting "fig spread" as a mainstay in consumers' kitchens, Dalmatia established its status as the leading brand of fig spread.

3. Dalmatia's considerable success is tied directly to its best-selling product: Original Fig Spread. Dalmatia spent years perfecting the recipe and production processes responsible for the unique flavor, texture, consistency and appearance of its Original Fig Spread. The Original Fig Spread recipe and production processes are the basis for other successful Dalmatia products: Orange Fig Spread and Fig Cocoa Spread. Dalmatia has always maintained the secrecy of its proprietary recipes and production processes, taking substantial measures to safeguard this information.

4. Defendant FoodMatch is a distributor specializing in Mediterranean food items. Dalmatia, in an attempt to further expand its business, entered into a distribution agreement with FoodMatch in 2006 (the "Distribution Agreement"), pursuant to which FoodMatch acted as Dalmatia's exclusive distributor in the United States and used its channels of distribution to increase Dalmatia's footprint.

5.      In October 2015, after Dalmatia properly notified FoodMatch that it was terminating the Distribution Agreement as of the year's end, FoodMatch decided to launch its own "Divina" brand versions of Dalmatia's fruit spreads. While the Distribution Agreement still was in effect, FoodMatch began developing, manufacturing and promoting Divina fig and orange fig spreads for sale in the United States.

6.      Out of the dozens of jam co-packers in the United States, FoodMatch hired Lancaster, Dalmatia's fig spread manufacturer in the United States, to create FoodMatch's fig and orange fig spreads. The reason is obvious: As Dalmatia's contract manufacturer for more than seven years, Lancaster had full knowledge of Dalmatia's proprietary recipes and manufacturing processes – information it was obligated to keep confidential and to use only for Dalmatia's benefit. Lancaster used that knowledge to create fig and orange fig spreads for FoodMatch to sell in competition with Plaintiff's fig spread products.

7.      As a result of this theft, FoodMatch was able to achieve with its Divina fig and orange fig spreads the distinctive characteristics of Dalmatia's fig spread – characteristics that no other company has been able to replicate since Dalmatia introduced its product. With Lancaster's assistance, FoodMatch began to sell the Divina products in January, 2016, immediately after the Distribution Agreement between FoodMatch and Dalmatia had expired, and FoodMatch was able to launch the products nationwide within weeks thereafter.

8.      The Defendants' willful disregard for Dalmatia's rights did not end with their misappropriation of trade secrets and flagrant breach of their non-competition agreements. Defendants also conspired to manufacture and sell Dalmatia's fig spread, using Dalmatia's DALMATIA trade mark and trade dress, without Dalmatia's knowledge or authorization.

9.     Lancaster manufactured and sold to FoodMatch, and FoodMatch then distributed to wholesalers and retailers, counterfeit DALMATIA fig spread products appearing identical to Dalmatia's genuine DALMATIA fig spread products.  These counterfeit DALMATIA products include batches of fig spread manufactured by Lancaster that Dalmatia had rejected due to poor quality as well as batches that Lancaster produced after Dalmatia prohibited it from continuing to manufacture DALMATIA products and which Dalmatia never approved or authorized.

10.     These counterfeit DALMATIA products have been and are still being sold in vast quantities by retailers from coast to coast, causing ongoing irreparable harm to Dalmatia's reputation, brand and sales, and deceiving consumers.

11.     To make matters worse, FoodMatch has bombarded long-time Dalmatia customers with patently false information about Dalmatia, including communicating to buyers that Dalmatia is exiting the business and that Dalmatia's products are no longer available.  In so doing, FoodMatch targeted Dalmatia's customers to push Dalmatia's fig spread products off the shelves of retailers throughout the country and replace them with unlawful Divina-brand fig spread products.

12.     Dalmatia has been forced to compete with both the counterfeit DALMATIA products which, unless emergency relief is granted, will remain on retailers' shelves for many months (as the product has a three year shelf life) and with the unlawful Divina-brand fig spread products that were created in blatant violation of Lancaster's and FoodMatch's non-compete agreements and which use the very proprietary recipes and production processes that Dalmatia spent over fifteen years developing and protecting.  Justice mandates that Defendants be stopped immediately from further sabotaging, usurping and destroying Dalmatia's business.

13.     Accordingly, Dalmatia has commenced this action against Defendants seeking injunctive relief, compensatory damages and punitive damages for Defendants' misappropriation of Dalmatia's trade secrets, unfair competition, breach of contract, tortious interference with contract, trademark infringement, counterfeiting, conversion and civil conspiracy.

## THE PARTIES

14.     Plaintiff Dalmatia Import Group, Inc. is a corporation organized and existing under the laws of Florida, with its principal place of business located at 28 West Flagler Street, Miami, Florida 33130.

15.     Defendant FoodMatch, Inc. is a corporation organized and existing under the laws of New York, with its principal place of business located at 575 Eighth Avenue, New York, New York 10018.

16.     Defendant Lancaster Fine Foods, Inc. is a corporation organized and existing under the laws of Pennsylvania, with a principal place of business located at 2320 Norman Road, Lancaster, Pennsylvania 17601.   Upon information and belief, Lancaster is a wholly-owned subsidiary of Earth Pride.

17.     Defendant Earth Pride Organics, LLC is a limited liability company organized and existing under the laws of Pennsylvania, with a principal place of business located at 2320 Norman Road, Lancaster, Pennsylvania 17601.   Upon information and belief, Earth Pride is Lancaster's parent company.

18.     Defendant Michael S. Thompson is an individual domiciled in Lititz, Pennsylvania.   Mr. Thompson is CEO of Earth Pride and President of Lancaster, as well as a controlling owner of both companies. Defendant Thompson oversaw, directed and was the moving force behind the unlawful conduct alleged in this Second Amended Complaint.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between Dalmatia and the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.  Plaintiff asserts causes of action arising under the federal Lanham Act, 15 U.S.C § 1114 and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b), and its state law claims are part of the same case or controversy.

21.     This Court has personal jurisdiction over FoodMatch because FoodMatch does business in Pennsylvania, including with respect to the allegations herein.  FoodMatch consented to personal jurisdiction when it consented to transfer of this action to this Court pursuant to 28 U.S.C. § 1404(a).

22.     This Court has personal jurisdiction over Lancaster, Earth Pride, and Thompson because they reside in Pennsylvania.  Additionally, they consented to personal jurisdiction when they consented to transfer of this action to this Court pursuant to 28 U.S.C. 1404(a).

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.  Defendants consented to venue in this district when they consented to transfer of this action to this Court pursuant to 28 U.S.C. § 1404(a).

**FACTUAL BACKGROUND**

I.     **Dalmatia Builds Its Business and Innovates Fig Spread in the United States.**

24.     Dalmatia is a company co-founded by Neb Chupin and Maia Magee in 1994. Dalmatia's origins are in Croatia – indeed the Dalmatia region of Croatia – where Mr. Chupin

grew up and Ms. Magee studied as a teenager. Mr. Chupin's grandfather dedicated his life to Croatian agriculture and was the inspiration behind Dalmatia, which was formed with the intention of supporting local economies, encouraging organic farming, and honoring the Dalmatian way of life. Initially, the company was dedicated to importing Croatian chocolate, olives, olive tapenades and extra virgin olive oil.

25.     In early summer 2000, Mr. Chupin and Ms. Magee were traveling in Croatia when they encountered a jar of fig preserves that reminded Mr. Chupin of his grandfather's fig preserves he enjoyed as a child. They decided to refocus the company towards creating a new version of Croatian fig preserves and named the product "fig spread."

26.     Mr. Chupin and Ms. Magee worked with and paid a food technologist to create the perfect recipe and production process for what is now known as Dalmatia Original Fig Spread. Countless hours were spent creating batches of early versions of the Original Fig Spread in small cookers, adjusting flavor nuances and perfecting texture, consistency and visual appeal, before settling on Dalmatia's first commercially-released spread.

27.     In late 2000, Dalmatia introduced the Original Fig Spread in the United States. At the time, it was the only fig spread on the market, effectively inventing a new product name – fig spread – and a new category and niche in cheese departments across the country. It was an instant success.

28.     Based on the popularity of the Original Fig Spread, Dalmatia soon expanded its line of spreads to include Orange Fig Spread and Fig Cocoa Spread, among others. Developing each of these spreads required many ingredient and process modifications to reach their respectively unique flavors, texture, consistency and appearance.

29. Dalmatia's spreads have gained widespread success and acclaim with consumers, and have won numerous industry awards. For example, the Original Fig Spread won first place for "Best Salsa, Sauce and Condiment" at the 2006 Americas Food and Beverage Show and Conference, and won the award for "Outstanding Shelf Stable Food Service Product" at the 2010 Summer Fancy Food Show. Orange Fig Spread won the 2004 NASFT Product Award for "Outstanding Jam, Preserve, Spread or Sweet Topping."

30. In the more than 15 years since Dalmatia launched its fig spread in the United States, no other manufacturer of fig preserves came close to replicating the unique characteristics of Dalmatia's product, which make it particularly well-suited for use as a cheese condiment.

**II.    Dalmatia Protects Its Brand With Registered Trademarks.**

31. To protect its brand, Dalmatia secured federal trademark registrations. Dalmatia owns an incontestable federal registration for DALMATIA for "dried fig spread." (Reg. No. 2,918,383.)

32. Dalmatia also owns an incontestable federal registration for the jar configuration in which the product is sold also for "dried fig spread." (Reg. No. 3,667,176.)

33. The protected configuration is shown below:



34. Dalmatia is vigilant in monitoring its manufacturers to ensure that products sold under the DALMATIA brand meet Dalmatia's high quality standards. Dalmatia regularly

evaluates samples produced by its manufacturers and objects, or refuses to purchase products, when the samples do not meet Dalmatia's standards.

**III.    Dalmatia's Recipes and Production Processes Are Trade Secrets.**

35.    Dalmatia's spreads have achieved this considerable success by virtue of their unique characteristics, which result through a combination of their recipes and production processes.  The proprietary recipes are expressed in lists and percentages of ingredients, as well as specifications and sourcing information for the ingredients.  The production processes consist of particular steps for the preparation, mixing, and cooking of the ingredients – in a particular order – as well as parameters, such as cooking time, temperature and Brix levels at various stages of the process.

36.    The Dalmatia Original Fig Spread, Orange Fig Spread and Fig Cocoa Spread that are currently on the market reflect Dalmatia's proprietary recipes and production processes, which Dalmatia does not, and never has, made public.

37.    Dalmatia has always been diligent in its efforts to maintain the secrecy of its proprietary information.  Dalmatia only shares its recipes and production processes with parties with whom Dalmatia has entered into a non-disclosure agreement, and even then, limits disclosures to the extent necessary and designates written disclosures as "confidential."

**IV.    Dalmatia Enters Into a Distribution Agreement With FoodMatch.**

38.    In or around spring 2005, Dalmatia sought to expand its distribution.  Dalmatia approached FoodMatch, a distributor of a wide array of antipasto items.  Dalmatia believed the Original Fig Spread would be a unique and new complement to FoodMatch's product line, which, at the time, did not include any sweet items.

39.    On or around December 22, 2006, Dalmatia entered the Distribution Agreement with FoodMatch.  Pursuant to the Distribution Agreement, FoodMatch obtained the exclusive right to distribute Dalmatia's food products in the United States.

40.    As part of the Distribution Agreement, FoodMatch agreed not to sell or promote any competitive products similar to Dalmatia's.  Paragraph 1(c) of the Distribution Agreement provides, in relevant part, that "FoodMatch agrees that during the Term of this Agreement, it will not sell or promote in the Territory any competitive products that are similar to the Products,[2] or that originate or are held out as being from Croatia." Paragraph 1(e) of the Distribution Agreement, which has no time limitation, provides that "FoodMatch agrees that it will not manufacture, purchase, or sell products in the Territory[3] that directly compete with the products."

41.    The Distribution Agreement also contained a clause to protect Dalmatia's intellectual property rights, including Dalmatia's "trademarks, service marks, copyrights, trade names, logos, symbols" (referred to in the Distribution Agreement as the "Marks"), as well as "proprietary rights used in or by Dalmatia in connection with the manufacture, marketing, sale and distribution of the Products," from any improper or unauthorized use by FoodMatch. (Distribution Agreement at ¶ 7(a).)

42.    Pursuant to the Distribution Agreement, FoodMatch agreed that the Marks and Dalmatia's proprietary rights used in connection with the manufacture, marketing, sale and distribution of the Products are the exclusive property of Dalmatia. (*Id.*)

---

[2] "Products" is defined as "certain branded food products of Dalmatia," as set forth as an exhibit to the Distribution Agreement.

[3] "Territory" is defined as the United States and U.S. Territories.  Distribution Agreement at ¶ 1(a).

43.     Pursuant to the Distribution Agreement, Dalmatia granted to FoodMatch "a limited, revocable license within the Territory during the term of [the] Agreement for the ancillary use of the Marks as pre-approved by Dalmatia in writing in connection with any sales, marketing and distribution activities of FoodMatch with respect to the Products."  (Distribution Agreement at ¶ 7(b).)

44.     The Distribution Agreement further provided that FoodMatch shall not "perform any act which would be inconsistent with any of Dalmatia's Marks or Intellectual Property or Dalmatia's ownership thereof."  (Distribution Agreement at ¶ 7(c).)

**V.     Dalmatia and FoodMatch Enter Into a Non-Disclosure Agreement to Protect Dalmatia's Proprietary Recipes and Production Processes.**

45.     In or about May 2007, Dalmatia and FoodMatch entered into a Non-Disclosure Agreement (the "FoodMatch Non-Disclosure Agreement").  It provides explicit protections for Dalmatia's proprietary recipes and production processes.  (FoodMatch Non-Disclosure Agreement at ¶ 1(a), (b).)

46.     "Information," as defined in the FoodMatch Non-Disclosure Agreement, includes Dalmatia's "information, recipes, ingredients, formula, methods, lists, reports or presentations" relating to Dalmatia's products.  (FoodMatch Non-Disclosure Agreement at ¶ 1(a).)

47.     The FoodMatch Non-Disclosure Agreement's "Objective" is clearly defined:

WHEREAS the Recipient [FoodMatch] shall evaluate and use such information in order to share it with certain Buyers who request and/or require such information in connection with their purchase of the Food Products from the Recipient for resale by the Buyers to consumers . . . .

48.     The FoodMatch Non-Disclosure Agreement further provides that FoodMatch may disclose Dalmatia's confidential information to buyers only after obtaining a similar non-disclosure agreement from the buyers.  (FoodMatch Non-Disclosure Agreement at ¶ 1(b).)

49.     FoodMatch also explicitly recognized "the value and importance to [Dalmatia] of such proprietary information and the need to keep it strictly confidential." (FoodMatch Non-Disclosure Agreement at p. 1.)

50.     FoodMatch also agreed that it would use Dalmatia's confidential information "solely in connection with the Objective, and *for no other purpose whatsoever*." (FoodMatch Non-Disclosure Agreement at ¶ 3 (emphasis added).)

51.     The FoodMatch Non-Disclosure Agreement provided that it:

> "shall remain in force for a period of all times while the Recipient is an authorized distributor of Discloser's Food Products and for three (3) years following the termination of any distributor relationship between the parties."

(FoodMatch Non-Disclosure Agreement at ¶ 5(a).)

## VI.     Dalmatia Begins Working With Lancaster's Predecessor and Enters into a Non-Disclosure Agreement.

52.     In order to bring its products to market, Dalmatia enters into written agreements with manufacturers to produce its products. From about September 2008 to October 2015, Lancaster manufactured fig spread for Dalmatia.

53.     Prior to Dalmatia's relationship with Lancaster, it began discussions with Lancaster's predecessor, Beanies of Lancaster, Inc. ("Beanies"), for Beanies to manufacture and supply Dalmatia's fig spread using Dalmatia's recipe.

54.     Beginning in about May 2007, Beanies and Dalmatia took initial steps, over a period of more than a year, toward establishing their business relationship. This included purchasing new equipment, retooling existing equipment, research and development, test production, sourcing ingredients and materials, and working out pricing analysis for production costs.

55. Recognizing that their contemplated business relationship would require Dalmatia to disclose confidential information about its recipes and manufacturing processes, Dalmatia and Beanies entered into a non-disclosure agreement dated May 21, 2007 (the "Beanies Non-Disclosure Agreement").

56. The Beanies Non-Disclosure Agreement provides explicit protections for Dalmatia's proprietary recipes and production processes.

57. Pursuant to the Beanies Non-Disclosure Agreement, Beanies agreed that it would use Dalmatia's confidential information including "recipe specifics" "in order to copackage (produce, package, label, etc.) solely for [Dalmatia]" and for no other purpose. (Beanies Non-Disclosure Agreement at p. 1 and ¶ 3.)

58. Beanies further agreed that it would keep Dalmatia's information confidential and not disclose it to any third party. (Beanies Non-Disclosure Agreement ¶ 1(b).)

59. The Beanies Non-Disclosure Agreement provided that it would remain in force indefinitely. (Beanies Non-Disclosure Agreement ¶ 4(a).)

## VII. Dalmatia Teaches Lancaster How to Make Dalmatia's Proprietary Fig Spread.

60. In June 2007, Dalmatia provided to Beanies' product developer, Matthew Hunt, Dalmatia's confidential, proprietary recipes for its fig spread and orange fig spreads.

61. In about September 2007, Beanies and Dalmatia began a research and development phase in which Mr. Hunt made test batches of Dalmatia's fig spread using Dalmatia's proprietary recipe. The goal of the research and development was for Beanies to learn how to make fig spread meeting Dalmatia's specifications.

62. Even with the recipe in hand, Beanies had difficulty replicating Dalmatia's fig spread, particularly in matching its consistency and taste. Over the course of about eleven months, Beanies made test batch after test batch.

63.     Throughout the research and development phase, and even after Lancaster began manufacturing Dalmatia's fig spread, Dalmatia provided confidential information about its ingredients and manufacturing methods to Mr. Hunt to teach Beanies and Lancaster how to make the product.

64.     At all times in their relationship with Dalmatia, Beanies and Lancaster were obligated to keep information about Dalmatia's recipe and manufacturing process confidential and not to use that information for the benefit of anyone other than Dalmatia.

**VIII.    Earth Pride and Lancaster Take Over Beanies.**

65.     Unbeknownst to Dalmatia, on or about February 29, 2008, Beanies, its owners David and Arlene Esh, and a related business, C.O. Nolt & Son, Inc., entered into an agreement with Earth Pride to sell the Beanies business (the "Asset Purchase Agreement"). Among the co-owners of Earth Pride were Defendant Thompson and his business partner Doug Harris.

66.     The Asset Purchase Agreement provided that Earth Pride would purchase "substantially all of the assets of Seller related to the Business" of Beanies. (Asset Purchase Agreement at 1.) "Business" is defined to mean "the manufacture of a variety of food products, including mustards, dressings, hot and BBQ sauces, jellies, and jams." (*Id.*)

67.     Section 1.1 of the Asset Purchase Agreement provides:

> Upon and subject to the terms and conditions contained in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Purchaser **all of Seller's assets used in the Business** (collectively the "Acquired Assets"), free and clear from all liens and encumbrances of any kind whatsoever, **including**, **without limitation**, the following assets, properties and rights of Seller:

(*Id.* (emphasis added).)

68.     As specified in Section 1.1(d)(iv), the phrase "all of Seller's assets used in the Business" included "Intangible Assets," including "all licenses, franchise agreements or other

consents or approvals granted to the Seller by third parties for the use of trademarks, trade names, computer software and other intellectual property."

69. As specified in Section 1.1(e), "all of Seller's assets used in the Business" also included agreements listed on Schedule 2.6, which included contracts necessary to the operation of the Business, such as equipment leases, services agreements, and the lease for the Beanies facility at 2320 Norman Road.

70. Around the time of the execution of the Asset Purchase Agreement, months before the transaction actually closed, Thompson and Harris assumed control of Beanies' business. David Esh, the founder of Beanies, entered into an employment agreement by which Esh worked for Thompson and Harris and/or Earth Pride. Harris became the president of Beanies, as well as Dalmatia's principal business contact. Dalmatia did not know of Harris's connection to Earth Pride.

71. The sale of the Beanies business to Earth Pride closed on or around July 31, 2008, at which point Earth Pride became the owner of all assets associated with the Beanies business, and Beanies of Lancaster, Inc. ceased all operations.

72. Earth Pride also assumed liabilities of Beanies necessary for the operation of the business, including Beanies' obligations under equipment leases, agreements with service providers, and the lease for the manufacturing facility.

73. In August, 2008, Earth Pride and Thompson formed Lancaster to operate the Beanies business.

74. Doug Harris continued to manage the Beanies business as president of Lancaster.

75. Lancaster continued to operate Beanies, as it had been doing (through Earth Pride, Thompson and Harris) since at least February 2008, without interruption, in the same facility and with the same management, employees and assets.

76. Pursuant to the Asset Purchase Agreement, the sellers retained an interest in the Beanies business in that Mr. Esh became an employee of Earth Pride and because Section 1.3(a) provided for payment of an "Additional Sum" to the sellers in an amount equal to 10% of the gross sales of Beanies in excess of $3,500,000 realized from the sale of certain products during the one-year period ending December 31, 2013.

## IX.   Dalmatia and Lancaster's Predecessor Enter Into a Supply Agreement.

77. Just two weeks before the closing of Earth Pride's purchase of Beanies, Dalmatia and Beanies entered into a Product Manufacture and Supply Agreement dated July 16, 2008 (the "Supply Agreement"). The Supply Agreement was the result of significant negotiations between Ms. Magee and Doug Harris.

78. The Supply Agreement was signed by Doug Harris for Beanies, who was then president of Beanies and co-owner of Earth Pride. Earth Pride, therefore, knew and intended that it would acquire the Supply Agreement from Beanies, and that it would assume the obligations of Beanies under the Supply Agreement, after the asset transfer was complete.

79. Section 2.8(a) of the Supply Agreement, entitled "Noncompetition," provides, in part:

> During the Term of this Agreement and for a period of two years thereafter or, upon termination of this Agreement by Beanies for a period of two years thereafter (the "Noncompetition Period,") Beanies shall not make manufacture, process, test, label, store, and/or sell the Product or any similar competitive fig spreads on its own account or for any customer in any manner or conduct any business which is in any way competitive with [Dalmatia] in the Territory (the "Noncompetition Restrictions"); . . .

80. Section 2.8(b) of the Supply Agreement provides, in part:

Upon the termination of this Agreement by [Dalmatia] other than for Cause, Beanies shall no longer be subject to the Noncompetition Restrictions; provided however, that Beanies shall be restricted from using the Formula in any way and shall also be restricted from selling to or otherwise contacting or utilizing any of [Dalmatia's] vendors, customers or packaging profile for the remainder of the Noncompetition Period. For the avoidance of doubt, the relaxation of the Noncompetition Restrictions in this subsection (b) is made so as to allow Beanies to fulfill as co-packer orders from unaffiliated Beanies' customers dealing in fig spreads with their own proprietary fig spread recipes. Notwithstanding the foregoing, if [Dalmatia] terminates the Agreement for Cause, then the Noncompetition Restrictions shall remain in place for the duration of the Noncompetition Period.

81. The Supply Agreement excludes from the Noncompetition Restrictions only one fig preserves product that Beanies had been manufacturing for Dutch Valley under the Jake and Amos label. (*Id.* ¶ 2.8(a) and Ex. C.)

82. The Supply Agreement defines the "Product" as fig spreads manufactured by Beanies for Dalmatia. (Supply Agreement ¶ 1.2.) The "Term" of the Agreement began on July 16, 2008, and is renewed automatically from year to year unless terminated by either party at least 90 days before the end of a renewed term. (*Id.* ¶ 3.1.) The "Territory" is defined as "the entirety of the United States and Canada, its territories and possessions." (*Id.* ¶ 1.3.) The "Formula" is defined as the proprietary fig spread recipe described on Exhibit A of the Supply Agreement. (*Id.* ¶ 1.1.)

83. The Supply Agreement also contains an Intellectual Property section, which provides:

[Dalmatia] retains all rights, title and interest to its Marks (as defined below). Any reproduction or distribution except as expressly permitted herein without [Dalmatia's] prior written approval is strictly prohibited. All trademarks, service marks, copyrights, trade names, trade dress, logos, symbols (the "Marks"), trade secrets, patents and patent applications and other proprietary rights used by [Dalmatia] in connection with the manufacturing, labeling, marketing, sale and distribution of the Products (collectively, the "Intellectual Property") are the exclusive property of [Dalmatia]. Beanies acknowledges that, except as expressly provided in Section 2.10, it shall not acquire any rights or licenses for the use of

any of [Dalmatia's] Intellectual Property.  All use of the Marks by Beanies shall solely insure to the benefit of [Dalmatia].

(Supply Agreement ¶ 2.10.)

84.    The Supply Agreement also provides the following license to Beanies:

[Dalmatia] grants to Beanies a limited, non-exclusive, royalty-free revocable license (the "License") within the Territory to utilize the Formula and the Marks solely in connection with the manufacture, packaging, and shipping of the Product exclusively for [Dalmatia], subject to the terms, conditions and restrictions set forth in this Agreement. Such License shall be terminable upon any default under this Agreement. Upon the end of the term of this Agreement or any earlier termination (described in Section 3.2), the License shall automatically terminate and Beanies shall have no right, title or interest in the Mark or Intellectual Property of [Dalmatia]. Beanies shall not have any right to use the Formula to produce the Product for anyone other than [Dalmatia].

(Supply Agreement ¶ 2.11.)

85.    The Supply Agreement also provides that Beanies would: meet Dalmatia's written specification for the products; manufacture the products in a finished form suitable for consumption by the consumer; strictly conform to Dalmatia's formula, methods of manufacture, standards of quality, and sanitation and other specifications and instructions, and; in the event of Dalmatia's rejection of respondent's defective or conforming product, replace the rejected product at no cost to Dalmatia and make arrangements with Dalmatia for the disposition of the products.

86.    The Supply Agreement also provides that:

- Dalmatia had provided Beanies with "written formulations, specifications, process instructions, container quantity, plant certifications, packaging and labeling instructions," defined in the Agreement as the "Specifications" for the fig spread (*id.* ¶ 1.4);

- Prior to the beginning of production, Dalmatia funded the purchase of "certain equipment ... for Beanies to produce the Product (the 'Purchased Equipment')" and Beanies would maintain the Purchased Equipment for the term of the Agreement and would be required to return it at the end of the term (*id.* ¶ 2.3);

- Beanies would charge, and Dalmatia would prepay for the fig spread (*id.* ¶ 2.7 and Exh. B);

18

- Dalmatia would provide Beanies with "all labeling, consumer packaging and outer shipment packing for the [fig spread] (the 'Packaging Profile')," which is proprietary (*id.* ¶ 2.9);

- The Agreement is binding upon and inured to the benefit of successors (*id.* ¶ 11.6); and

- The Agreement is governed by and construed under the laws of the Commonwealth of Massachusetts (*id.* ¶ 11.7).

## X.  Lancaster Takes Over as Dalmatia's Manufacturer.

87.    In or about September 2008, Lancaster began full-scale manufacturing of Dalmatia's fig spread at Beanies' facility located at 2320 Norman Road, Lancaster, Pennsylvania, using the Formula, Specifications, Purchased Equipment and Packaging Profile. As far as Dalmatia knew, the company was still Beanies.

88.    In September 2008, Dalmatia received a fax and invoice from "Lancaster Fine Foods, Inc." directing it to pay for its fig spread by wire transfer to Lancaster's bank.  The printed legend on the fax cover sheet from Lancaster said "Beanies of Lancaster" and was sent by Deb Brubaker, an employee of Beanies.  The Lancaster invoice included an address, telephone number, fax number, e-mail and website address which were unchanged from Beanies' address, telephone number, fax number, e-mail (info@beaniesoflancaster.com) and website address (www.beaniesoflancaster.com).

89.    On or about October 22, 2008, Lancaster sent Dalmatia a letter "officially" announcing that it had "acquired the assets of Beanies of Lancaster" and that this was "a continuation of a process" that had begun in spring 2008.  The letter is signed by Michael Thompson.

90.    Lancaster never informed Dalmatia that Lancaster did not consider itself bound by the Supply Agreement.  Lancaster acted at all times as though it were operating under the Supply Agreement.

91.     At all times, Lancaster manufactured the fig spread at the same facility where Beanies had produced Dalmatia's product (at 2320 Norman Road, Lancaster, Pennsylvania), and Dalmatia continued working with the exact same staff at Lancaster that it had previously worked with when the company was Beanies, including Mr. Harris and Mr. Hunt.

92.     Lancaster also continued to use the Formula Dalmatia provided to Beanies per the Supply Agreement; continued to use the Specifications Dalmatia provided to Beanies per the Agreement; continued to use the jars Dalmatia had delivered to Beanies per the Agreement; continued to use the Purchased Equipment Dalmatia had bought for Beanies per the Agreement; continued to use the Packaging Profile for the fig spread per the Agreement; and continued to charge the same prices to Dalmatia per the Agreement (with an agreed-upon surcharge for sugar).

93.     Dalmatia continued to order and purchase fig spread from Lancaster under the Supply Agreement until late October 2015.

94.     Dalmatia placed orders for fig spread by issuing Purchase Orders to Lancaster stating a quantity of fig spread and a requested delivery date for each order. Lancaster invoiced Dalmatia for its orders.

95.     Lancaster delivered fig spread ordered by Dalmatia by making it available for pick-up by FoodMatch's carriers.

96.     Dalmatia never terminated the Supply Agreement.

97.     Lancaster never terminated the Supply Agreement.

XI.   **Lancaster Begins to Have Product Quality Problems.**

98.     In about April 2015, Dalmatia noticed that the quality of the fig spread manufactured by Lancaster had become inconsistent and that, increasingly, Lancaster's product did not meet Dalmatia's specifications. Some of the problems included fig spread that did not set

(gel) properly, such that it was too soft, too hard or had a liquid layer; undercooked or hard pieces of figs; fig stems found in the product; and stones found in the product.

99. Dalmatia decided that it needed to keep a close eye on Lancaster to ensure that products not meeting Dalmatia's quality standards would not be sold to customers and cause harm to Dalmatia's brand and reputation for high quality.

100. Dalmatia requested that Lancaster send Ms. Magee a sample of fig spread from each hour of every production run. Ms. Magee examined and tasted the samples to determine if they met Dalmatia's quality standards. She then notified Lancaster whether the batches were approved and could be released for shipment to FoodMatch.

101. On multiple occasions between May and October 2015, Dalmatia notified Lancaster that batches of fig spread did not meet Dalmatia's quality standards and were not to be released for shipment to FoodMatch. Dalmatia rejected all or some of the batches produced on at least the following dates in 2015: May 27, July 30, August 6, September 18, September 25, September 29, September 30, October 26, October 27 and October 28.

102. Dalmatia attempted to work with Lancaster to solve the product quality problems. However, by late October 2015, Lancaster still was not able to consistently produce fig spread meeting Dalmatia's specifications.

103. Rather than continue to reject Lancaster's product, Dalmatia decided that it had to stop further manufacturing by Lancaster until Lancaster could fix its quality control issues.

104. On or about November 5, 2015, Dalmatia instructed Lancaster to stop manufacturing fig spread.

105.    At that time, Dalmatia had multiple unfilled orders for fig spread from FoodMatch. Dalmatia refused to fill those orders with product made by Lancaster that did not meet its quality standards.

106.    Instead, Dalmatia attempted to fill FoodMatch's orders as much as possible by ordering replacement fig spread from its manufacturer in Croatia. Dalmatia incurred significant costs to obtain replacement fig spread on a rush basis from Croatia, including costs for expedited shipment overseas.

107.    However, Dalmatia was not able to fill all of FoodMatch's orders before the end of the Distribution Agreement. As a result, Dalmatia lost the profits it otherwise would have received on FoodMatch's orders.

108.    Lancaster's inability to produce fig spread meeting Dalmatia's specifications also forced Dalmatia to incur losses, including added costs for shipping, import duties, higher costs of purchasing in Euros, and delays in supply because the Croatian facility was unprepared to produce the fig spread normally made by Lancaster.

109.    Also in early November 2015, Lancaster refused to release batches of finished fig spread that Dalmatia had approved and paid for unless Dalmatia also paid for other batches it had rejected and pre-paid for batches that had not yet been manufactured. Because Dalmatia needed the approved fig spread to fill FoodMatch's orders, it had no choice but to make these payments – totaling about $58,000 – under duress.

**XII.    FoodMatch and Lancaster Unlawfully Conspire Against Dalmatia.**

110.    On or about October 5, 2015, Dalmatia notified FoodMatch that it would be terminating the Distribution Agreement as of December 31, 2015, and switching to a new distributor in January 2016.

111.     FoodMatch immediately set out to develop its own line of Divina fruit spreads to replace the Dalmatia products.   FoodMatch determined that, to successfully compete with Dalmatia's market-leading products, it needed to match Dalmatia's distinctive taste, consistency and other qualities, which set its products apart from all other fig preserves.  FoodMatch decided that it would launch the Divina products at the Winter Fancy Food Show, a trade show, which was scheduled to take place from January 17th to 19th, 2016.

112.     FoodMatch initially went to a Greek company, Bretas, to begin developing recipes for its competing Divina fruit spreads.   FoodMatch provided Bretas with samples of Dalmatia's fig and orange fig spreads to match.   Bretas produced multiple small batch samples, but was unable to match the characteristics of Dalmatia's spreads.

113.     At about the same time, Thompson and FoodMatch President Philip Meldrum realized that they had something in common – they both were angry with Dalmatia and Ms. Magee.  Thompson and Meldrum spoke in October and early November, 2015, and agreed that they would help each other out while also punishing Dalmatia and Ms. Magee.

114.     Specifically, they agreed that they would help each other by using Lancaster's knowledge of how to make Dalmatia's fig spread to produce the Divina fig spreads.  They also agreed that they would help each other by selling DALMATIA branded fig spread without Dalmatia's authorization.

**XIII.    FoodMatch and Lancaster Unlawfully Use Dalmatia's Proprietary Recipe and Manufacturing Process to Create Competing Divina Fig Spreads.**

115.     As part of the agreement between FoodMatch and Lancaster, FoodMatch became the exclusive distributor of fig and orange fig spreads manufactured by Lancaster for sale under FoodMatch's Divina brand.   FoodMatch never considered hiring any other co-packer in the United States to make these products.

116. Before FoodMatch began discussions with Lancaster, FoodMatch knew that Dalmatia had contracted with Lancaster to manufacture DALMATIA-brand fig spread and that Lancaster had confidential knowledge of Dalmatia's proprietary recipes and manufacturing processes.

117. As part of the deal between FoodMatch and Lancaster, FoodMatch required – and Lancaster agreed – that Lancaster would end its relationship with Dalmatia.

118. In late October 2015, Lancaster also committed that it would meet FoodMatch's extremely aggressive deadline to have the Divina fig and orange fig spreads ready for launch by mid-January.

119. It would have been impossible, in that timeframe, to independently create recipes for FoodMatch and to successfully scale them up for production. But FoodMatch, Lancaster, and Thompson knew that Lancaster would be able to create the Divina products in such short order because Lancaster already knew how to make Dalmatia's fig spread.

120. Thompson and Lancaster designated its Director of Product Development Matthew Hunt, and FoodMatch designated its Corporate Chef Brett Greenberg, as the people primarily responsible for developing the Divina fig and orange fig spread recipes.

121. When they began working together, in late October and early November, 2015, Mr. Hunt asked Mr. Greenberg for FoodMatch's fig spread formula and information about the specifications FoodMatch desired. Mr. Greenberg informed Mr. Hunt that he did not have a formula or "any strict parameters."

122. He further directed Mr. Hunt that, "[t]he product we know and have become used to will be the basis for development." In other words, Mr. Greenberg told Mr. Hunt to base development of the Divina fig spread on Dalmatia's product.

123. Mr. Greenberg and FoodMatch relied on Lancaster's Mr. Hunt to create the Divina recipes and achieve FoodMatch's specifications for the product. Of course, having worked on product development and manufacture of Dalmatia's fig spread for more than eight years, Mr. Hunt was intimately familiar with Dalmatia's formulations and manufacturing processes.

124. Lancaster took no steps to avoid using Dalmatia's proprietary information. Rather, it intentionally used Mr. Hunt's knowledge of Dalmatia's trade secrets in order to fulfill its promise to FoodMatch that it would be ready to launch Divina fig and orange fig spreads matching Dalmatia's special characteristics in just two months' time.

125. Mr. Hunt and Defendants Lancaster and Thompson did exactly what FoodMatch directed – they based the Divina fig spread recipes and manufacturing process on their knowledge of Dalmatia's confidential recipes and manufacturing process.

126. By exploiting Lancaster's knowledge of Dalmatia's trade secrets, Defendants Lancaster, FoodMatch, and Thompson were able to produce Divina fig and orange fig spreads replicating the distinctive flavor, texture, and appearance of Dalmatia's products.

127. Defendant Lancaster, under Defendant Thompson's direction and control, began manufacturing Divina fig and orange fig spreads for Defendant FoodMatch in late 2015, while the Distribution Agreement between Dalmatia and FoodMatch was still in effect.

**XIV.  FoodMatch Launches Its Divina Fig Spreads.**

128. As planned, Defendant FoodMatch launched the Divina fig and orange fig spreads at the Winter Fancy Food Show in January 2016. But some of the Divina-brand products were distributed as early as January 1, 2016 – literally the day after the Distribution Agreement between Plaintiff and FoodMatch expired. The Divina products are available in the same packaging options offered by Dalmatia – retail, bulk and mini-cups.

129.    In early 2016, FoodMatch also launched "Ficoco" (fig with cocoa) spread to compete with Dalmatia's fig cocoa spread, as well as a fig spread with Kalamata olives and almonds.

130.    FoodMatch has aggressively and misleadingly marketed its Divina spreads to Dalmatia's customers, and had been doing so prior to the December 31, 2015, termination of the Distribution Agreement.    Several of Dalmatia's customers reported that FoodMatch misrepresented to them that Dalmatia's spreads were discontinued or that Dalmatia was no longer in business, and offered them Divina spreads as replacements.

131.    During the Fancy Food Show, Dalmatia customers informed Dalmatia that FoodMatch provided them with side-by-side taste test comparisons of Dalmatia and Divina samples and, after establishing that they were comparable products, offered the Divina spreads at a significant discount to Dalmatia's price points.

132.    Dalmatia learned that significant customers switched to FoodMatch's Divina spreads after being approached by FoodMatch and being courted with these unfair business practices.

133.    Yet another customer informed Ms. Magee at the January Fancy Food Show that it had tested FoodMatch's fig spread "several months ago," and, going forward, would only be carrying the new spread, which was offered at a significant discount to the prices offered by Dalmatia.

134.    Thus, Defendant FoodMatch had developed and promoted the Divina spreads while still acting as Dalmatia's distributor, notwithstanding the clear prohibition of such conduct in the Distribution Agreement.

135.    Upon conducting taste tests, Dalmatia discovered that the Divina spreads share identical flavor profiles and consistencies with their Dalmatia counterparts, clearly indicating that FoodMatch's Divina spreads are utilizing Dalmatia's recipes and production processes.

## XV.    Lancaster and FoodMatch Manufacture and Sell Counterfeit DALMATIA Fig Spread Infringing Dalmatia's Trademarks.

136.    While they were working together to make Divina brand fig spreads, FoodMatch and Lancaster – and their respective Presidents, Meldrum and Thompson –  also conspired to sell DALMATIA-brand fig spread, using Dalmatia's trademark and trade dress, without Dalmatia's authorization.

137.    Specifically, Lancaster sold to FoodMatch, which in turn sold to sub-distributors and retailers, jars of what purports to be DALMATIA fig spread that, according to the "best by" dates and lot coding on the labels, were manufactured by Lancaster on October 26, 27 and 28, 2015.

138.    These products are identical in appearance to Dalmatia's fig spread and use the DALMATIA trademark and Dalmatia's jar configuration.

139.    Lancaster used labels, hangtags and jars supplied by Dalmatia to manufacture the counterfeit goods on October 26, 27 and 28, 2015.

140.    These counterfeit products are of inferior quality to Dalmatia's authorized products. In early November, Dalmatia notified Lancaster that all of the fig spread it produced on October 26, 27 and 28, 2015, was rejected due to quality problems and was not to be released for shipment to FoodMatch.

141.    These rejections followed rejections of batches manufactured by Lancaster on May 27, July 30, August 6, September 18, September 25, September 29, and September 30.

Some of the batches produced on each of those dates were rejected by Dalmatia due to quality problems and were not to be released for shipment to FoodMatch.

142.     Additionally, Lancaster manufactured and sold to FoodMatch, which in turn sold to sub-distributors and retailers, jars of purported DALMATIA fig spread that, according to the "best by" dates and lot codes on their labels, were manufactured on November 13 and 16, 2015, after Dalmatia instructed Lancaster to halt all production.

143.     Lancaster used jars, labels and hangtags supplied by Dalmatia in manufacturing these products on November 13 and 16, 2015.

144.     In addition, Lancaster has manufactured and sold to FoodMatch, which in turn sold to sub-distributors and retailers, jars of purported DALMATIA fig spread that have no "best by" date or lot coding. Dalmatia never has authorized the sale of fig spread without such coding, which is essential for tracing product in the event of a recall.

145.     All of these counterfeit DALMATIA products, which were rejected or unauthorized by Dalmatia, have been sold in massive quantities by retailers across the country and are still being sold. There are likely additional lots of counterfeit DALMATIA fig spread on the market that Dalmatia has not yet discovered.

146.     Lancaster never invoiced Dalmatia, and Dalmatia never paid Lancaster, for the fig spread Lancaster produced on October 26, October 27, October 28, November 13 or November 16.

147.     Dalmatia never invoiced FoodMatch, and FoodMatch never paid Dalmatia, for the fig spread Lancaster produced on October 26, October 27, October 28, November 13 or November 16.

148.    Rather, Lancaster and FoodMatch cut Dalmatia completely out of the loop and pocketed the profits from their sale of products using DALMATIA's trademarks.

149.    Meldrum and Thompson personally directed and controlled the manufacture and sale of the counterfeit DALMATIA products.

150.    Meldrum and Thompson did so with intent to destroy Dalmatia's reputation and business.

**XVI.    Lancaster and Thompson Steal Labels and Jars from Dalmatia.**

151.    When Dalmatia directed Lancaster to cease production of Dalmatia products, Lancaster had in its possession a substantial supply of Dalmatia's materials.  This included 139,000 unused Dalmatia labels, 156,900 unused hangtags and more than 290,000 Dalmatia jars. These items, though in Lancaster's possession, remained Dalmatia's property.

152.    Dalmatia demanded that Lancaster return the items to Dalmatia.

153.    Lancaster refused.

154.    Dalmatia contacted the sheriff's department of Lancaster County, Pennsylvania. A sheriff went to Lancaster's facility to recover the items and spoke with Thompson.  Thompson refused to return them.

155.    Without Dalmatia's permission, and at Thompson's direction, Lancaster used or disposed of all of Dalmatia's hangtags, approximately 59,000 labels, and about 170,000 jars.

156.    Lancaster and Thompson did not agree to return any of the items remaining in its possession until after they became defendants in this case.

**XVII.    Defendants' Wrongdoing Is Causing Dalmatia Irreparable Harm.**

157.    With each day that passes, Defendants' wrongdoing is causing Dalmatia further irreparable harm.

158.    Dalmatia's sales of its Original Fig Spread in the first quarter of 2016 were down approximately 36% compared to average first quarter sales in the past two years.  But this figure does not accurately represent the full extent Dalmatia's monetary losses because Dalmatia's new distributor has been able to acquire new accounts.  Dalmatia does not yet know the extent to which it has lost sales from customers that had previously been buying Dalmatia's products through FoodMatch.

159.    The harm does not end with lost sales. Dalmatia has invested a tremendous amount of time and money developing its brand and product line and has worked tirelessly to gain the recognition it deserves as a supplier of premium fruit spreads.  Dalmatia's reputation, built over the past sixteen years of business, for providing unique, high-quality fruit spreads is being irreparably harmed by Defendants' sale of inferior quality counterfeit goods that consumers will believe were authorized by Dalmatia.

160.    Defendants' unlawful acts have already resulted in real and tangible harm to Dalmatia's brand and goodwill as Dalmatia is losing customers to Defendants' unlawful Divina fig spread products which are essentially the same products, but at lower price points.  By offering its offending products at a substantial discount, Defendant FoodMatch has captured shelf-space with Dalmatia's customers, effectively pushing Dalmatia spreads off the shelves of retailers.  Indeed, FoodMatch has expressed to customers that this is its goal.

161.    As a result of the introduction to the market of the Divina products, customers that previously purchased Dalmatia products are dropping Dalmatia and switching to Divina. Customers that switched already include Big Y, Chef's Warehouse, Classic Provisions, Dierbergs, Dole & Bailey, Italfoods, Lucky's Markets, Lunds and Byerlys, Mariano's, Marsh Supermarkets, and Shamrock Foods.  Additional customers are now carrying both Divina and

Dalmatia fig spreads: A&T Italian Foods, BK Foods, DPI Specialty Foods, Gourmet Foods International, Jon's Marketplace, KeHE Distributors, Monterrey Provisions, Peterson Cheese, Seacrest Foods International, ShopRite and Zabar's.

162.    Most of these customers that are now buying Divina fig spreads are distributors that sell to many retailers and food service companies throughout a region or nationwide. For example, Gourmet Foods International and KeHE sell to retailers and food service businesses across the country. As another example, Dole & Bailey is a distributor that sells to retailers throughout New England.

163.    It is possible that Dalmatia has lost many more customers as a result of Lancaster's and FoodMatch's unlawful competition. Dalmatia does not have complete information about how many or which customers it has lost because FoodMatch, Dalmatia's exclusive US distributor for nearly 10 years, never provided Dalmatia with a list of the customers that purchased Dalmatia products, even though Dalmatia requested it.

164.    Ultimately, Dalmatia's loss of customers extends to the consumer level.  Once a consumer switches from Dalmatia to Divina, that customer may never switch back.

**COUNT I**
**AGAINST FOODMATCH, LANCASTER, AND THOMPSON**
**Misappropriation of Trade Secrets**

165.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 164 as though fully set forth herein.

166.    Dalmatia's recipes, ingredient specifications, and production processes relating to its Original Fig Spread and Orange Fig Spread are proprietary trade secrets and Dalmatia has taken substantial measures to maintain their secrecy.

167.    FoodMatch has misappropriated Dalmatia's trade secrets by exploiting Lancaster's confidential relationship with Dalmatia to create Divina brand fig and orange fig

spreads derived from Dalmatia's trade secret recipes, ingredient specifications, and production processes.

168.     Lancaster, at Thompson's direction, has misappropriated Dalmatia's trade secrets by using its knowledge of Dalmatia's trade secret recipes, ingredient specifications, and manufacturing processes to develop fig and orange fig spreads for FoodMatch.

169.     As a direct and proximate result of the wrongful conduct of FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer irreparable injury.

170.     As a direct and proximate result of the wrongful conduct of FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer money damages.

**COUNT II**
**AGAINST FOODMATCH**
**Breach of Contract – Distribution Agreement**

171.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 170 as though fully set forth herein.

172.     On or about December 22, 2006, Dalmatia and FoodMatch entered into the Distribution Agreement, which is a valid and enforceable contract.

173.     At all relevant times, Dalmatia performed its duties under the Distribution Agreement.

174.     FoodMatch breached its obligations under the Distribution Agreement by using Dalmatia's proprietary manufacturing information, trade secrets, trademarks, and trade dress for its own benefit and without Dalmatia's approval.

175.     FoodMatch also breached its obligations under the Distribution Agreement by manufacturing, selling and/or promoting its Divina line of competing fruit spreads during and after the term of the Distribution Agreement.

176.	As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer irreparable injury.

177.	As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT III**
**AGAINST FOODMATCH**
**Breach of Contract – FoodMatch Non-Disclosure Agreement**

178.	Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 177 as though fully set forth herein.

179.	On or about May 14, 2007, Dalmatia and FoodMatch entered into the FoodMatch Non-Disclosure Agreement, which is a valid and enforceable contract.

180.	At all relevant times, Dalmatia performed its duties under the FoodMatch Non-Disclosure Agreement.

181.	Defendant FoodMatch breached its obligations under the FoodMatch Non-Disclosure Agreement by using confidential information about Dalmatia's products, recipes and manufacturing processes in the manufacture, sale and/or promotion of its Divina brand fruit spreads.

182.	As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer irreparable injury.

183.	As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT IV**
**AGAINST FOODMATCH, LANCASTER AND THOMPSON**
**Unfair Competition**

184.	Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 183 as though fully set forth herein.

185.     By their wrongful acts, Defendants, in bad faith, knowingly misappropriated Dalmatia's confidential and proprietary information for use in their businesses through the manufacture, sale and/or promotion of Divina brand fig spread and orange fig spread in competition with Dalmatia.

186.     Defendants wrongfully used, for their own unfair commercial advantage, proprietary information that Dalmatia had developed through considerable expenditure of resources and effort.

187.     Defendants also caused a likelihood of confusion through the distribution and sale of counterfeit DALMATIA products, bearing both Plaintiff's incontestable and federally registered DALAMTA mark and incontestable and federally registered jar configuration in competition with Plaintiff.

188.     As a direct and proximate result of the wrongful conduct by Defendants, Dalmatia has suffered and continues to suffer irreparable injury.

189.     As a direct and proximate result of the wrongful conduct of Defendants, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT V**
**AGAINST LANCASTER AND EARTH PRIDE**
**Breach of Contract – Supply Agreement**

190.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 189 as though fully set forth herein.

191.     On or about July 16, 2008, Dalmatia entered into the Supply Agreement, which is a valid and enforceable contract, with Lancaster's and Earth Pride's predecessor.

192.     Earth Pride acquired the Supply Agreement when it acquired all assets of Beanies used in the Beanies business.

193.    The Supply Agreement is binding on Lancaster and/or Earth Pride as successors in interest to Beanies who agreed to assume the obligations of the Supply Agreement.

194.    Alternatively, the Supply Agreement is binding on Lancaster and/or Earth Pride because they acquired the Beanies business as a result of a *de facto* merger and are carrying on as a mere continuation of the Beanies business.

195.    As described above, Earth Pride and Lancaster operated the Beanies business before and after the asset purchase, without interruption, in the same facility, with the same president and other management, the same employees, and the same assets.

196.    There was a continuity of ownership interests because the sellers of Beanies retained an interest in the revenues of the business in that they were entitled to receive the Additional Sum as partial consideration for the sale and because Mr. Esh continued as an employee of Earth Pride.

197.    Furthermore, Beanies of Lancaster, Inc. ceased its business operations after it sold all assets of the business to Earth Pride, and Earth Pride assumed obligations of Beanies necessary for the uninterrupted continuation of its normal business operations, including property and equipment leases.

198.    At all relevant times, Dalmatia performed its duties under the Supply Agreement.

199.    Lancaster and/or Earth Pride breached the Supply Agreement by manufacturing, processing, testing, labeling, storing, and/or selling similar competitive fig spreads for FoodMatch and other customers and by conducting business competitive with Dalmatia.

200.    Lancaster and/or Earth Pride breached the Supply Agreement by using Dalmatia's trademarks and trade dress without Dalmatia's prior written approval.

201. Lancaster and/or Earth Pride breached the Supply Agreement by using, without Dalmatia's authorization, Dalmatia's trade secrets and other proprietary rights in connection with the manufacturing, labeling, marketing, sale and distribution of its fig spread.

202. Lancaster and/or Earth Pride breached the Supply Agreement by using Dalmatia's Formula for the benefit of FoodMatch.

203. Lancaster and/or Earth Pride breached the Supply Agreement by: failing to meet Dalmatia's written specification for the product; by manufacturing the products in finished form that was not suitable for consumption by the consumer; by failing to strictly conform with Dalmatia's formula, methods of manufacture, standards of quality and sanitation and other specifications and instructions; by failing to replace rejected product at no cost to Dalmatia; and by failing to make arrangements with Dalmatia for the disposition of each rejected product.

204. Lancaster and/or Earth Pride breached the Supply Agreement by refusing to release conforming product, for which Dalmatia had paid, unless Dalmatia also paid for non-conforming product and for product that had not yet been manufactured.

205. As a direct and proximate result of the wrongful conduct by Lancaster and/or Earth Pride, Dalmatia has suffered and continues to suffer irreparable injury.

206. As a direct and proximate result of the wrongful conduct by Lancaster and/or Earth Pride, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT VI**
**AGAINST LANCASTER AND EARTH PRIDE**
**Breach of Contract – Beanies Non-Disclosure Agreement**

207. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 206 as though fully set forth herein.

208. On or about May 21, 2007, Dalmatia entered into the Beanies Non-Disclosure Agreement, which is a valid and enforceable contract, with Lancaster's and Earth Pride's predecessor.

209. At all relevant times, Dalmatia performed its duties under the Beanies Non-Disclosure Agreement.

210. As described above, the Beanies Non-Disclosure Agreement is binding on Lancaster and/or Earth Pride as successors in interest to Beanies who agreed to assume its obligations or as a result of their *de facto* merger with, and continuation of the business of, Beanies.

211. Lancaster and/or Earth Pride breached the Beanies Non-Disclosure Agreement by using Dalmatia's confidential information for purposes not authorized in the agreement, including by using Dalmatia's confidential information about its recipes and manufacturing processes to develop competing products for FoodMatch.

212. Lancaster and/or Earth Pride further breached the Beanies Non-Disclosure Agreement by disclosing confidential information about Dalmatia's recipes and manufacturing processes to FoodMatch.

213. As a direct and proximate result of the wrongful conduct by Lancaster and/or Earth Pride, Dalmatia has suffered and continues to suffer irreparable injury.

214. As a direct and proximate result of the wrongful conduct by Lancaster and/or Earth Pride, Dalmatia has suffered and continues to suffer substantial money damages.

## COUNT VII
## AGAINST FOODMATCH
### Tortious Interference with Contract

215. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 214 as though fully set forth herein.

216. The Supply Agreement and Beanies Non-Disclosure Agreement are valid contracts between Dalmatia and Lancaster.

217. FoodMatch knew that Dalmatia and Lancaster had a manufacturing contract and that Lancaster had agreed not to use or disclose Dalmatia's confidential information without Dalmatia's approval.

218. FoodMatch intentionally procured Lancaster's breach of these contracts without justification by hiring Lancaster to manufacture competing fig spreads for FoodMatch, which were derived from Dalmatia's confidential recipe and manufacturing process information, and by inducing Lancaster to manufacture and sell fig spreads using Dalmatia's trademarks without Dalmatia's authorization.

219. Lancaster breached the contracts as stated in Counts V, VI and XIV.

220. But for FoodMatch's interference, Lancaster would not have committed these breaches because Lancaster could not have otherwise distributed the fig spreads it made using Dalmatia's trademarks, trade secrets and confidential information.

221. As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer irreparable injury.

222. As a direct and proximate result of the wrongful conduct by FoodMatch, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT VIII**
**AGAINST FOODMATCH, LANCASTER AND THOMPSON**
**Trademark Infringement and Unfair Competition in Violation of 15 U.S.C. Section 1114**

223. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 222 as though fully set forth herein.

224. Dalmatia owns the federally registered, incontestable, trademarks DALMATIA for fig spread, Reg. No. 2,918,383, and an incontestable federal registration for a jar

configuration for fig spread, Reg. No. 3,667,176. Dalmatia also owns common law rights in this mark and jar configuration on account of its long and continuous use in commerce and substantial advertising and sales of products bearing the mark and contain in the configuration.

225.    Defendants are using Dalmatia's identical trademark and jar configuration in connection with the advertising, promotion, distribution and sale of fig spread without Dalmatia's authorization and with the specific intent to cause consumers and others in the trade to believe that they are purchasing a genuine DALMATIA fig spread when in reality they are purchasing a counterfeit DALMATIA fig spread.

226.    Defendants' unauthorized use of Dalmatia's trademark and trade dress jar configuration is likely to cause confusion, to cause mistake and to cause deception that Defendants' products come from or are endorsed, approved or licensed by Dalmatia.

227.    Defendants' wrongful conduct has deprived Plaintiff of, among other things, the right to control the reputation and goodwill associated with its trademarks and jar configuration.

228.    Unless Defendants are enjoined from engaging in their wrongful conduct, Plaintiff will suffer further irreparable injury and harm, including to its goodwill and reputation, for which it has no adequate remedy at law.

229.    As a direct and proximate result of the wrongful conduct by FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT IX**
**AGAINST FOODMATCH, LANCASTER AND THOMPSON**
**Trademark Counterfeiting In Violation of 15 U.S.C Section 1114**

230.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 229 as though fully set forth herein.

231. Dalmatia owns the federally registered, incontestable, trademarks DALMATIA for fig spread, Reg. No. 2,918,383, and an incontestable federal registration for a jar configuration for fig spread, Reg. No. 3,667,176.

232. Defendants are using a spurious trademark and trade dress jar configuration that is identical to Dalmatia's DALMATIA mark and trade dress jar configuration in connection with their advertising, promotion, distribution and sale of the identical products identified in Plaintiff's registrations, i.e., fig spread, without Dalmatia's authorization, which constitutes trademark counterfeiting in violation of 15 U.S.C. § 1114(a).

233. Defendants' wrongful conduct has deprived Plaintiff of, among other things, the right to control the reputation and goodwill associated with its trademarks.

234. Unless Defendants are enjoined from engaging in their wrongful conduct, Plaintiff will suffer further irreparable injury and harm, including to its goodwill and reputation, for which it has no adequate remedy at law.

235. As a direct and proximate result of the wrongful conduct by FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT X**
**AGAINST FOODMATCH, LANCASTER AND THOMPSON**
**Violations of The Defend Trade Secrets Act of 2016**
**(18 U.S.C. Section 1836(b))**

236. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 235 as though fully set forth herein.

237. Dalmatia's recipes and production processes relating to its Original Fig Spread and Orange Fig Spread are proprietary trade secrets and Dalmatia has taken substantial measures to maintain their secrecy.

238. FoodMatch has misappropriated Dalmatia's trade secrets by exploiting Lancaster's confidential relationship with Dalmatia to create Divina brand fig and orange fig spreads derived from Dalmatia's trade secret recipes and production processes.

239. At Thompson's direction, Lancaster has misappropriated Dalmatia's trade secrets by using its knowledge of Dalmatia's trade secret recipes and manufacturing processes to develop fig and orange fig spreads for FoodMatch.

240. As a direct and proximate result of the wrongful conduct of FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer irreparable injury.

241. As a direct and proximate result of the wrongful conduct of FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT XI**
**AGAINST LANCASTER AND THOMPSON**
**Conversion**

242. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 241 above.

243. Lancaster and Thompson deprived Dalmatia of its right in the use and possession of its property, including at least 139,000 unused Dalmatia labels, 156,900 hangtags and 290,000 Dalmatia jars by refusing to return this property when requested and by using the property to manufacture fig spread without Dalmatia's authorization.

244. Lancaster and Thompson did so without Dalmatia's consent.

245. Lancaster and Thompson did so without lawful justification.

246. Dalmatia suffered damages as a result of Lancaster's and Thompson's conduct.

## COUNT XII
## AGAINST FOODMATCH, LANCASTER AND THOMPSON
### Civil Conspiracy

247. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 246 as though fully set forth herein.

248. FoodMatch, Lancaster and Thompson entered into an agreement to use Dalmatia's trade secret and propriety information as the basis for the Divina fig spread recipes and manufacturing processes – acts that constitute misappropriation of trade secrets and unfair competition.

249. FoodMatch, Lancaster and Thompson took acts, and intentionally participated in, the furtherance of this plan by using Lancaster's confidential knowledge of Dalmatia's fig spread recipe and manufacturing processes to create the Divina fig spreads.

250. FoodMatch, Lancaster and Thompson also entered into an agreement to use Dalmatia's trademarks without authorization – acts that constitute trademark infringement, counterfeiting and unfair competition.

251. FoodMatch, Lancaster and Thompson took acts, and intentionally participated in, the furtherance of this plan by selling fig spread bearing Dalmatia's trademarks that Dalmatia had not authorized for sale and that Dalmatia had not authorized to be manufactured.

252. As a direct and proximate result of the wrongful conduct of FoodMatch, Lancaster and Thompson, Dalmatia has suffered and continues to suffer irreparable injury.

253. As a direct and proximate result of the wrongful conduct by FoodMatch, Lancaster, and Thompson Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT XIII**
**AGAINST LANCASTER**
**Breach of Purchase Order Agreements**
**(Alternative to Count V)**

254.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 253 above.

255.    Between May and October 2015, Dalmatia placed orders with Lancaster for the manufacture and sale of fig spread meeting Dalmatia's quality standards and specifications.

256.    Lancaster accepted Dalmatia's purchase orders and, therefore, had a binding obligation to deliver the ordered quantities of fig spread meeting Dalmatia's quality standards and specifications.

257.    At all relevant times, Dalmatia performed its obligations with respect to the purchase order agreements.

258.    Lancaster breached the purchase order agreements by failing to manufacture fig spread meeting Dalmatia's quality standards and specifications.

259.    As a direct and proximate result of the wrongful conduct by Lancaster, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT XIV**
**AGAINST LANCASTER**
**Breach of Confidentiality Agreement**
**(Alternative to Count VI)**

260.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 259 as though fully set forth herein.

261.    In exchange for Dalmatia's agreement to do business with Lancaster, Lancaster promised that information about Dalmatia's fig spread recipes, ingredients, and manufacturing processes would be kept confidential, not disclosed to anyone without Dalmatia's permission, and not used for the benefit of anyone other than Dalmatia.

43

262. The parties' agreement regarding confidentiality constitutes a valid, binding contract.

263. At all relevant times, Dalmatia performed its duties under the confidentiality agreement.

264. Lancaster breached the confidentiality agreement by disclosing confidential information about Dalmatia's recipes, ingredients and manufacturing processes to FoodMatch without Dalmatia's permission and by using that confidential information to develop and manufacture fig spreads for FoodMatch.

265. As a direct and proximate result of the wrongful conduct by Lancaster, Dalmatia has suffered and continues to suffer irreparable injury.

266. As a direct and proximate result of the wrongful conduct by Lancaster, Dalmatia has suffered and continues to suffer substantial money damages.

**COUNT XV**
**AGAINST LANCASTER**
**Equitable Estoppel**
**(Alternative to Counts V and VI)**

267. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 266 as though fully set forth herein.

268. If Lancaster did not acquire and assume the obligations of the Supply Agreement and the Beanies Non-Disclosure Agreement, that was a material fact that was known to Lancaster and which it misrepresented and concealed from Dalmatia.

269. Lancaster misrepresented and concealed this fact by stating in Thompson's October 2008 letter that it had "acquired the assets of Beanies of Lancaster" and that this was "a continuation of a process" that had begun in spring 2008.

270.    Lancaster knew that Dalmatia believed the Supply Agreement and the Beanies Non-Disclosure Agreement controlled their relationship, yet Lancaster never told Dalmatia that it had not acquired or assumed the obligations of those Agreements.

271.    Lancaster intentionally misrepresented and concealed that it had not assumed the obligations of the Supply Agreement and the Beanies Non-Disclosure Agreement so that Dalmatia would continue to do business with Lancaster.

272.    Dalmatia did not know, and had no reason to know, that Lancaster was not bound by the Supply Agreement or the Beanies Non-Disclosure Agreement.

273.    Dalmatia relied on Lancaster's misrepresentations in believing that Lancaster had, in fact, assumed the obligations of both Agreements.  Had Dalmatia known that Lancaster did not consider itself bound by those Agreements, Dalmatia would not have continued to do business with Lancaster.

274.    Dalmatia continued to do business with Lancaster for about seven years, which allowed Lancaster to receive considerable benefits, including profits and a consistent income stream.

275.    As described above, Dalmatia has incurred substantial money damages and irreparable harm as a direct and proximate result of Lancaster's supply of competitive fig spread products to FoodMatch and its other breaches of the Supply Agreement and Beanies Non-Disclosure Agreement.

276.    In light of these facts, it would be unjust and inequitable to allow Lancaster to avoid the obligations of the Supply Agreement and the Beanies Non-Disclosure Agreement.

## THE WANTONNESS OF DEFENDANTS' WRONGFUL CONDUCT

277. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 276 as though fully set forth herein.

278. Defendants' conduct alleged herein is intentional, outrageous and exhibits a high degree of moral culpability. Defendants have acted with a fraudulent motive and have consistently, willfully and wantonly disregarded Dalmatia's rights.

279. Defendants acted with malice toward Dalmatia and Maia Magee.

280. Defendants conspired to harm Dalmatia by unfairly competing against it. Defendants have used, and continue to use, Dalmatia's confidential and proprietary trade secret recipes and production processes in developing and manufacturing FoodMatch's fruit spreads.

281. FoodMatch concealed its willful misconduct by falsely representing to Dalmatia and to the Court that it developed its fig and orange fig spread independently in Greece.

282. Defendants also purposefully sought to harm Dalmatia's business and reputation by manufacturing and selling counterfeit fig spread using Dalmatia's trademarks. They intentionally sold counterfeit products of inferior quality to harm Dalmatia's goodwill, while simultaneously flooding the market to suppress demand for Dalmatia's authentic products. They did this for profit and to create a competitive advantage for the Divina products.

283. Likewise, FoodMatch acted with a fraudulent motive in deceiving Dalmatia's customers into believing that Dalmatia discontinued its products, and in otherwise misleadingly and aggressively targeting Dalmatia's customers in an effort to drive Dalmatia out of business.

284. Defendants' conduct was knowingly, intentional, willfully and wantonly reckless, malicious, and/or grossly negligent, which justifies an award of punitive damages, in addition to compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dalmatia respectfully requests this Court to:

(i)     Permanently enjoin FoodMatch and Lancaster (including their officers, directors, employees, agents, and all persons acting in concert with them) from using or benefiting, directly or indirectly, from the use of Dalmatia's confidential and proprietary trade secret information, including, but not limited to, preventing any further manufacture, sale and/or promotion of Divina brand fig spread and orange fig spread and any other fig-based spread derived from Dalmatia's proprietary information;

(ii)    Order that Defendants (including their officers, directors, employees, agents, and all persons acting in concert with them) immediately return all of Dalmatia's confidential and proprietary trade secret information in their possession, custody or control;

(iii)   Order that Defendants (including their officers, directors, employees, agents, and all persons acting in concert with them) immediately destroy and certify under oath the destruction of all materials derived in any way directly or indirectly, in whole or in part, from any of Dalmatia's confidential and proprietary trade secret information, including, but not limited to, the Divina fig spread and orange fig spread;

(iv)    Preliminarily and permanently enjoin Defendants from use of the DALMATIA trademark and Dalmatia's jar configuration or of any mark or trade dress confusingly similar to Dalmatia's;

(v)     Order the seizure or delivering up to Plaintiff's counsel of all counterfeit DALMATIA products in Defendants' possession, custody or control, as well as all means that may be used by Defendants to engage in further trademark counterfeiting or infringement;

(vi)     Order Defendants to conduct a market withdrawal of all counterfeit DALMATIA products at their own expense and offer full refunds to all affected customers;

(vii)    Order Defendants to recall all Divina-brand fig spreads at their own expense and offer full refunds to all affected customers;

(viii)   Permanently enjoin Defendants from otherwise engaging in acts, either directly or through other entities, of counterfeiting, trademark infringement, trade secret misappropriation or unfair competition;

(ix)     Order Defendants to pay Dalmatia compensatory damages in an amount to be proven at trial;

(x)      Order Defendants to pay prejudgment and post judgment interest under New York law;

(xi)     Order Defendants to disgorge all unjust enrichment;

(xii)    Order Defendants to pay punitive damages in the maximum amount permitted by law;

(xiii)   Order Defendants to pay statutory damages for trademark counterfeiting in the maximum amount permitted under the federal Lanham Act, which is $4 million dollars for use of two "counterfeit" marks;

(xiv)    Order Defendants to pay costs, prejudgment and post judgment interest and attorney's fees for violations of the federal Lanham Act, 15 U.S.C. section 1051 *et seq.*, and the Defend Trade Secrets Act of 2016, 18 U.S.C. section 1836(b)(3)(D);

(xv)     Order Defendants to pay treble damages and treble unjust enrichment profits for violations of the federal Lanham Act, 15 U.S.C. section 1051 *et seq.*, and exemplary damages of

two times the amount of damages awarded under the Defend Trade Secrets Act of 2016, 18 U.S.C. section 1826(b)(3)(B);

(xvi) Order corrective advertising in a form that is acceptable to the Court and Plaintiff;

(xvii) Order an award of costs pursuant to 28 U.S.C. § 1920; and

(xviii) Order such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts of its Second Amended Complaint so triable.

August 1, 2016

Respectfully submitted,

/s/ *Lauren E. Handel*
Samuel E. Cohen (Pa. ID# 204617)
GROSS MCGINLEY, LLP
33 South Seventh Street, PO Box 4060
Allentown, Pennsylvania 18105
(610) 820-5450

Lauren E. Handel
HANDEL FOOD LAW LLC
75 Washington Valley Road #416
Bedminster, New Jersey 07921
(908) 206-4103

Michael S. Nadel
John J. Dabney
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
(202) 756-8000

*Attorneys for Dalmatia Import Group, Inc.*
*and Maia Magee*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2016 a true and correct copy of the foregoing was served by email on all counsel pursuant to Paragraph 8 of the Scheduling Order, including as follows:

*Counsel for Lancaster Fine Foods, Inc., Earth Pride Organics, LLC, and Michael S. Thompson:*

George J. Krueger, Esq.
Alexandra C. Scanlon, Esq.
Brian Berkley, Esq.
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103

*Counsel for FoodMatch, Inc.:*

Richard Feldman, Esq.
Michael Smith, Esq.
Rosenberg Feldman Smith, LLP
551 Fifth Avenue, Floor 24
New York, New York 10176

*/s/ Lauren E. Handel*
Lauren E. Handel