IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALMATIA IMPORT GROUP, INC., et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | NO. 16-2767 |
| | : | |
| v. | : | |
| | : | |
| FOODMATCH, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION AND ORDER

This matter has been referred to this Court by the Honorable Edward G. Smith for discovery purposes.  Plaintiff Dalmatia Import Group, Inc. ("Dalmatia") seeks an order that Defendant FoodMatch, Inc. ("FoodMatch") has waived its attorney-client privilege with respect to certain communications between it and its outside counsel, Richard Feldman, Esquire ("Feldman"), during October and November 2015.  Dalmatia bases this request on the fact that FoodMatch attached certain emails between its President, Phil Meldrum ("Meldrum"), and Feldman to an affidavit filed in opposition to a motion for a preliminary injunction that Dalamatia sought against FoodMatch in parallel litigation filed in the United States District Court for the Southern District of New York, Dalmatia Import Grp. v. FoodMatch, Inc., No. 16 Civ. 0933 (GBD) (S.D.N.Y.).  Dalmatia contends that this use of privileged attorney-client information gives rise to a subject matter waiver regarding communications between FoodMatch and Feldman during the relevant period.  For the reasons articulated below, Dalmatia's request will be denied.

**I.       BACKGROUND**

This action arises out of disputes between Dalmatia and FoodMatch over the termination of a Distribution Agreement under which FoodMatch served as the distributor for Dalmatia fruit spread products, obtaining the products from manufacturers selected by Dalmatia and supplying them to wholesale customers, such as supermarkets.[1] In its Second Amended Complaint, Dalmatia alleges, <u>inter alia</u>, that FoodMatch and Defendant Lancaster Fine Foods, Inc. misappropriated its proprietary fruit spread recipes and production process to launch a "copycat" line of fruit spreads under FoodMatch's Divina brand label. Second Am. Compl. (Doc. No. 53) ¶ 1. FoodMatch has filed a Counterclaim alleging that that Dalmatia breached the Distribution Agreement by "failing and/or refusing to fill" certain orders that FoodMatch placed and by selling products instead to another distributor, Atalanta Corp. ("Atalanta"). Answer & Countercl. (Doc. No. 61) ¶¶ 314-15.

FoodMatch bases its Counterclaim on the following allegations. Under the Distribution Agreement, FoodMatch was Dalmatia's exclusive distributor for fruit spread products within a defined territory. Answer & Countercl. ¶ 292. The Distribution Agreement expired December 31, 2015, but could be automatically extended. <u>Id.</u> ¶¶ 292-93, 295. In a letter dated October 5, 2015, Dalmatia gave notice to FoodMatch that it would not renew the Distribution Agreement, effectively terminating the agreement as of December 31, 2015. <u>Id.</u> ¶ 295. During the remaining term of the Distribution Agreement, FoodMatch was obligated to use its best efforts to promote the sale of Dalmatia products, <u>id.</u> ¶ 293, while Dalmatia was required to work in good faith to fulfill FoodMatch's orders for its products, <u>id.</u> ¶ 294. After the notice of termination, Dalmatia intentionally failed to supply FoodMatch with products to fill its orders and informed FoodMatch

---

[1] Because this Memorandum Opinion is primarily for the benefit of the parties, the complex history of the dispute between the parties will only be briefly summarized here.

that Dalmatia's new distributor, Atalanta, would fill FoodMatch's customers' orders after the Distribution Agreement expired.  Id. ¶¶ 297-98.  Rather than supply FoodMatch with its products, as required under the Distribution Agreement, Dalmatia misrepresented to FoodMatch that Dalmatia's product manufacturer, Hermes, located in Croatia, did not have sufficient capacity to fill FoodMatch's orders.  Id. ¶ 298.  Dalmatia then stockpiled Hermes' production of fruit spread so that Atalanta could sell the products to FoodMatch's customers after it became Dalmatia's new distributor on January 1, 2016.  Id. ¶ 299.  The attorney-client communications currently at issue were made during the October to November 2015 period when FoodMatch was seeking a supply of Dalmatia's fruit spreads in order to fill its customers' orders and Dalmatia allegedly was withholding that supply.

In January 2016, subsequent to the termination of the Distribution Agreement, FoodMatch began selling its own brand of fruit spreads called Divina.  Second Am. Compl. ¶ 128.  On February 8, 2016, Dalmatia filed an action in the Southern District of New York seeking, inter alia, to enjoin FoodMatch from using its trade secrets in the production of FoodMatch's Divina-brand fruit spread.  Compl. ¶ 1, Dalmatia Import Grp. v. FoodMatch, Inc., No. 16 Civ. 0933 (GBD) (S.D.N.Y. Feb. 18, 2016).[2]  As part of its opposition to Dalmatia's request for an injunction, FoodMatch submitted the affidavit of its President, Meldrum.  Meldrum Aff. (Doc. No. 1-74).  In his affidavit, Meldrum sets forth FoodMatch's contention that Dalmatia had misrepresented that it could not fill FoodMatch's orders and had stockpiled its manufacturer's production to be used by Atalanta, after the termination of FoodMatch's distributorship, to supply FoodMatch's former customers.  Meldrum Aff. ¶¶ 28-41.

---

[2]  The pleadings from the Southern District of New York litigation appear as Docs. No. 1-1 to 1-148.  The Complaint from that action is Doc. No. 1-1.

Dalmatia relies for its waiver claim on two paragraphs of Meldrum's affidavit and two exhibits attached to the affidavit in support of those two paragraphs. The first of the two paragraphs states as follows:

> By letter dated October 29, 2015, Dalmatia asserted that it would not produce products for FoodMatch in Croatia and would instead fill all of FoodMatch's orders through Atalanta after the Termination Date. Upon information and belief, Dalmatia was using its factory in Croatia to produce these Dalmatia labeled products for Atalanta's distribution even though it was contractually obligated to meet FoodMatch's orders. See Exhibit K.

Meldrum Aff. ¶ 33. Exhibit K to the Meldrum Affidavit, submitted to support the allegations of the foregoing paragraph, consists of an email between FoodMatch's purchasing agent, Samarah Greene ("Greene"), and a Dalmatia employee, Jazmine Sanlley ("Sanlley"), which Meldrum forwarded to Feldman along with his own comments. Letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley, Ex. D (September 4, 2016) [hereinafter "September 4 Nadel Letter"].[3] In the email, Greene forwarded purchase orders to Dalmatia from FoodMatch's customer, ACME, in which ACME requested that the arrival dates for its orders be accelerated. Id. Meldrum's forwarding email to Feldman reads as follows:

> Whole foods and their distributor acme pushed up the etas for the last three container orders we received on October 2 and transmitted to Dalmatia on 10/5 before we received the notice of termination later that day. Both Whole Foods and Acme wanted to protect us as they felt it was the right thing to do. These ship directly to Acme. We also sent the revised PO's to Neb [of Hermes] as he produces these at his plant in Croatia and he has not been receiving orders from Jazmin, Maia's [Dalmatia's co-founder] administrative person. Neb said he wants and needs to ship and gave us his word that he would honor these and ship to arrive in December. Let's see how this plays out.

Id.

---

[3]   The exhibits to the Meldrum affidavit are not included in Doc. No. 1-74.

The second paragraph of the Meldrum affidavit at issue here addresses FoodMatch's allegations that it sought to convince Dalmatia to timely supply it with products and that, when Dalmatia ultimately agreed to provide FoodMatch with some product from its Croatian manufacturer, it misrepresented the likely date when the product would be available. It reads as follows:

> We were aware that if the product was truly unavailable, we and Dalmatia would lose credibility with customers as they had placed orders for holiday store promotions. Thus, we pressed Dalmatia to ship some product to meet these orders. By email dated November 12, 2015, Jazmine informed us they were planning on shipping product on Thursday for an 11 day transit time. See Exhibit O. We knew that it would never arrive within the time constraints of these purchase orders.

Meldrum Aff. ¶ 37. Exhibit O to that affidavit contains an email from Sanlley to Meldrum stating that Dalmatia was "taking extraordinary measures to get product to FoodMatch" and would ship the product on a specific date "with an 11-day transit time." September 4 Nadel Letter Ex. D. Exhibit O to the Meldrum affidavit also contains Meldrum's email forwarding the Sanlley email to Feldman. The forwarding email states that:

> FYI
>
> Interesting that they now can get us product when they said a week ago that they couldn't ship a container ordered by whole foods. As the whole foods product already comes from Croatia, we are going to push for that container to ship first. This is critical as we have promotions set up at Whole Foods the last two weeks in December. Then we will ask for a container of regular fig for us. Never heard of a 11-day transit time. Realistically this is a month away considering transit time and clearance.

Id.

## II. **DISCUSSION**

Dalmatia contends that FoodMatch's use of the exhibits containing communications with Feldman in the Meldrum affidavit in opposition to Dalmatia's motion for injunctive relief in the parallel litigation in New York creates a complete subject matter waiver of the attorney-client

privilege for all communications between FoodMatch and Feldman relating to "fulfilling existing orders for Whole Foods" in October and November 2015. Letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley at 2 (October 5, 2016). FoodMatch contends that the privilege only has been waived as to the communications actually contained in the emails. Letter of Michael S. Smith, Esquire to the Honorable Marilyn Heffley at 2 (October 5, 2016). The United States Court of Appeals for the Third Circuit has summarized the law regarding the extent of the privilege waiver that occurs when a party makes a partial disclosure[4] of attorney-client communications as follows:

> Disclosing a communication to a third party unquestionably waives the privilege. A harder question is whether the waiver also ends the privilege as to any related but not disclosed communications. In answering this question, our touchstone is fairness . . .When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage. Zirn v. VLI Corp., 621 A.2d 773, 781-82 (Del. 1993) ("The purpose underlying the rule of partial disclosure is one of fairness to discourage the use of the privilege as a litigation weapon.") . . . Extending the waiver, however, is not a punitive measure, so courts do not imply a broader waiver than necessary to ensure that all parties are treated fairly . . . Moreover, when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed.

In re Teleglobe Commc'ns Corp., 493 F.3d 345, 361 (3d Cir. 2007), as amended (Oct. 12, 2007) (citations and footnote omitted).

Thus, when a party makes a partial waiver of the privilege, "the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary." Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1426

---

[4] "Parties engage in partial disclosure when they reveal only segments of privileged communication. . . . 'Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications.'" Harding v. Dana Transp., Inc., 914 F. Supp. 1084, 1092 (D.N.J. 1996) (quoting Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1426 (3d Cir. 1991)).

(3d Cir. 1991). And, when fairness requires a waiver, the waiver is no broader "than is necessary to ensure that all parties are treated fairly." In re Teleglobe Commc'ns., 493 F.3d at 361; see also King Drug Co. of Florence v. Cephalon, Inc., No. 2:06-CV-1797, 2011 WL 2623306, at *6 (E.D. Pa. July 5, 2011) ("[A] court will not impose a broader waiver than is necessary to undo an advantage gained by the party claiming the privilege."). Unfairness may occur "when a party attempts to use the communication in a litigation[5] or where the party "makes factual assertions, the truth of which can only be assessed by examination of the privileged communications." Net2Phone, Inc. v. Ebay, Inc., No. CIV. A. 06-2469 KSH, 2008 WL 8183817, at *10 (D.N.J. June 26, 2008) (citing In re Intel Corp. Microprocessor Litig., 258 F.R.D. 280 (D. Del. 2008)).

Here, Dalmatia relies on generalized arguments that a litigant should not be allowed to simultaneously use privilege as a sword and as a shield and that FoodMatch used the attorney-client communications contained in the exhibits to the Meldrum affidavit in support of its case. September 4 Nadel Letter at 5-6. It makes no effort, however, to specify how the limited use FoodMatch has made of the two emails at issue has created unfairness to Dalmatia in the particular circumstances of this lawsuit. FoodMatch has not asserted that the communications with its counsel that it disclosed in the exhibits to the Meldrum affidavit present it with any defense to Dalmatia's claims. In fact, the two emails do not contain any legal advice, but merely provide factual information from Meldrum to the attorney.

---

[5]  Examples of a party using a disclosure in a litigation are provided by cases in which a party asserts the attorney-client communication as a substantive defense, such as where a party defends on the grounds of advice of counsel, see, e.g., Glenmede Trust Co. v. Thompson, 56 F.3d 476, 486 (3d Cir. 1995) (trustee who relies on advice of counsel as defense against claim for breach of fiduciary duty); Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994) (patent litigant who relies on advice of counsel as defense against claim of willful infringement); see also Harding, 914 F. Supp. at 1096 (employer who relies on investigation by counsel as evidence of its efforts to remediate discrimination as a defense to a claim of hostile work environment).

Moreover, the factual information the emails communicate is not such that the truth of it only can be assessed by an examination of privileged communications. The first email recounts the history of an order in which a customer sought expedited delivery and FoodMatch's communications with Dalmatia concerning its request to expedite that delivery. Dalmatia can inquire as to the accuracy of the facts stated in the email through the depositions of the FoodMatch witnesses involved in those communications as well as through the review of the documents containing the communications. It also can depose the customer's personnel. The deposition of Feldman regarding the facts recited in the email is unnecessary.

The second email addresses the history of FoodMatch's efforts to obtain delivery of product from Dalmatia and FoodMatch's estimate of the likelihood that Dalmatia could provide a shipment of product from Croatia with an 11-day transit time. Again, other, and undoubtedly more informed, sources than Feldman exist from which Dalmatia can learn about the accuracy of the facts stated in the email. Thus, this is not a case where a party seeks to use attorney-client communications "'affirmatively in the controversy without permitting its adversary to inquire into the basis or accuracy of the disclos[ed information].'" In re Linerboard Antitrust Litig., 237 F.R.D. 373, 389 (E.D. Pa. 2006) (quoting Calvin Klein Trademark Trust v. Wachner, 124 F. Supp. 2d 207, 210 (S.D.N.Y. 2000)). Here, Dalmatia has every opportunity to inquire as to the facts contained in the emails from the parties who participated in the events and communications the emails recount. There is no need for Dalmatia to be able to inquire or review the communications of FoodMatch's counsel regarding those events, particularly because any knowledge he may have of them is second-hand. See In re Linerboard, 237 F.R.D. at 389-90 (rejecting subject matter waiver claim where party had the opportunity to explore the facts stated in the attorney-client communication through other witnesses and documents). There is no

unfairness to Dalmatia from FoodMatch's limited prior use of the emails and consequently, there is no basis to extend the waiver of the attorney-client privilege beyond the emails themselves. An appropriate Order follows.

## ORDER

AND NOW, this 12th day of October, 2016, upon consideration of the Letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley (September 4, 2016); the Letter of Michael H. Smith, Esquire to the Honorable Marilyn Heffley (October 5, 2016); and, the Letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley (October 5, 2016), **IT IS ORDERED** that Dalmatia's request that the Court impose on FoodMatch a subject matter waiver as to attorney-client communications relating to fulfilling existing orders for Whole Foods in October and November 2015 is **DENIED**.

BY THE COURT:

*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE