IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALMATIA IMPORT GROUP, INC., et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | NO. 16-2767 |
| | : | |
| v. | : | |
| | : | |
| FOODMATCH, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter has been referred to this Court by the Honorable Edward G. Smith for discovery purposes. In correspondence dated October 17, 2016, Defendants Lancaster Fine Foods, Inc., Earth Pride Organics, LLC, and Michael S. Thompson (collectively, "Lancaster") allege that counsel for Plaintiff Dalmatia Import Group, Inc. ("Dalmatia") improperly coached witness Ned Chupin ("Chupin") during breaks in the course of his recent deposition. October 17, 2016 letter of Brian A. Berkley, Esquire to the Honorable Marilyn Heffley [hereinafter "Berkley Letter"]. Lancaster requests that the Court strike certain deposition testimony, order a second deposition of Chupin, permit Lancaster to question Chupin regarding the conversations he allegedly had with counsel during those breaks and impose on Dalmatia the costs of the second deposition and the costs incurred by Lancaster in bringing the instant dispute before this Court. Lancaster further requests that the Court enforce the rules regarding communications with witnesses during depositions that are set forth in <u>Hall v. Clifton Precision</u>, 150 F.R.D. 525 (E.D. Pa. 1993), for all future depositions in this case. As discussed herein, Lancaster's request will be granted in part and denied in part.

I.     **BACKGROUND**

This action arises out of disputes between Dalmatia and Defendant FoodMatch, Inc. ("FoodMatch") over the termination of a Distribution Agreement under which FoodMatch served as the distributor for Dalmatia fruit spread products, obtaining the products from manufacturers selected by Dalmatia and supplying them to wholesale customers, such as supermarkets.[1]   In its Second Amended Complaint, Dalmatia alleges, inter alia, that FoodMatch and Defendant Lancaster Fine Foods, Inc. misappropriated its proprietary fruit spread recipes and production process to launch a "copycat" line of fruit spreads under FoodMatch's Divina brand label.   Second Am. Compl. (Doc. No. 53) ¶ 1.   Dalmatia also claims that FoodMatch breached the Distribution Agreement by selling fruit spread other than Dalmatia's products, id. ¶ 175, and that Lancaster breached its contract with Dalmatia by producing fruit spread that was below Dalmatia's quality standards, id. ¶¶ 255-58.   FoodMatch has filed a Counterclaim alleging that Dalmatia breached the Distribution Agreement by "failing and/or refusing to fill" certain orders that FoodMatch placed and by selling products instead to another distributor, Atalanta Corp. Answer & Countercl. (Doc. No. 61) ¶¶ 314-15.   Related to this claim, FoodMatch alleges that Dalmatia unjustifiably rejected certain products manufactured by Lancaster Fine Foods, Inc. as below required standards of quality.   Id. ¶¶ 300-03.

Deponent Chupin is a 50% owner of Dalmatia and the sole owner of a Croatian company, Hermes, which also manufactures fig spread for Dalmatia.   Id. ¶ 310.   Mr. Chupin resides in Croatia and, although it is not his native language, he is sufficiently fluent in English that he agreed for the deposition to be conducted in English.   Berkley Letter at 3 n.1; October 19, 2016 letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley.

---

[1]     Because this Memorandum Opinion is primarily for the benefit of the parties, the complex history of the dispute between the parties will only be briefly summarized here.

## II.  <u>LEGAL STANDARD</u>

In the widely-cited opinion in <u>Hall v. Clifton Precision</u>, the court gave the following explanation of the rules governing consultations between a deponent and his or her counsel during a deposition:

> The underlying purpose of a deposition is to find out what a witness saw, heard, or did—what the witness thinks. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers.
>
> . . .
>
> . . . Under Rule 30(c), depositions generally are to be conducted under the same testimonial rules as are trials. During a civil trial, a witness and his or her lawyer are not permitted to confer at their pleasure during the witness's testimony. Once a witness has been prepared and has taken the stand, that witness is on his or her own.
>
> The same is true at a deposition. The fact that there is no judge in the room to prevent private conferences does not mean that such conferences should or may occur. The underlying reason for preventing private conferences is still present: they tend, at the very least, to give the appearance of obstructing the truth.
>
> . . .
>
> These rules also apply during recesses. Once the deposition has begun, the preparation period is over and the deposing lawyer is entitled to pursue the chosen line of inquiry without interjection by the witness's counsel. Private conferences are barred during the deposition . . . .[2]

150 F.R.D. 525, 528-29 (E.D. Pa. 1993) (footnote omitted).

"The rule in <u>Hall</u> . . . on attorney-client communications is widely accepted among the Pennsylvania district courts." <u>Vnuk v. Berwick Hosp. Co.</u>, No. 3:14-CV-01432, 2016 WL 907714, at *3 (M.D. Pa. Mar. 3, 2016) (citing <u>Wise v. Washington Cnty.</u>, No. 10-1677, 2014 U.S. Dist. Lexis 29267, at *27 (W.D. Pa. Mar. 7, 2014)); <u>Plaisted v. Geisinger Med. Ctr.</u>, 210

---

[2] Under these rules, a deponent is entitled to consult with counsel regarding issues of privilege. <u>Hall</u>, 150 F.R.D. at 528.

F.R.D. 527, 535 (M.D. Pa. Oct. 15, 2002); O'Brien v. Amtrak, 163 F.R.D. 232, 236 (E.D. Pa.

1995); Applied Telematics, Inc. v. Sprint Corp., No. 94-CV-4603, 1995 WL 79237, at *2 (E.D.

Pa. Feb. 22, 1995); Langer v. Presbyterian Med. Ctr., Nos. 87-4000, 91-1814, 88-1064, 1995 WL

79520, at *11 (E.D. Pa. Feb. 17, 1995); AmerisourceBergen Drug Co. v. CuraScript, Inc., 83 Pa.

D. & C.4th 362, 373-74, No. 2272, 2007 WL 4593325 (Pa. Ct. Com. Pl. 2007).[3]

## III.  DISCUSSION

Lancaster contends that Chupin changed his testimony as the result of communications

with his counsel during deposition breaks with regard to three issues: (1) whether FoodMatch

was permitted under the Distribution Agreement to sell a product that competed with a Dalmatia

product; (2) whether products manufactured by Lancaster Fine Foods, Inc. that Dalmatia rejected

in November 2015 were of the required quality; and (3) whether Dalmatia informed third parties

that Lancaster Fine Foods, Inc. manufactured poor quality product.  Berkley Letter at 2.

### A.    Alleged Change in Testimony Regarding Whether FoodMatch Was Permitted to Sell a Product that Competed with a Dalmatia Product

Prior to a break in his deposition, Chupin gave the following testimony:

> Q.  So if FoodMatch decided to distribute a fig jam manufactured by someone else, would there have been anything wrong with that?
>
> A.  It would not.
>
> Q.  Just give me two minutes.  I think I may be done.  Why don't we take a short break?

---

[3]   Dalmatia argues that the rules articulated in Hall should not apply and cites In re Flonase Antitrust Litig., 723 F. Supp. 2d 761, 765-66 (E.D. Pa. 2010) in support of that proposition.  The Flonase court recognized that, under Pennsylvania law, "the 'privilege may be forfeited if its exercise will only frustrate the interests of justice.'"  Id. at 765 (quoting Nationwide Mut. Ins. Co. v. Fleming, 924 A.2d 1259, 1265 (Pa. Super. Ct. 2007)).  The court noted, however, that the witness "specifically testified that she was not coached by her lawyer during recess" and that "[t]here was no suggestion or hint that counsel had been engaging in any improper conduct."  Id. at 766.  Under these circumstances, the court held, any concern about frustrating the interests of justice had been eliminated.  Id.

Tr. at 411:19-412:2.  After the break, the deposition continued as follows:

> WITNESS:  I would like to correct my previous statement that I said previously that FoodMatch is actually not allowed to sell fig spread manufactured for somebody else. It's not allowed. Previously I said that it is; but looking at the contract, it is not.
>
> Q.  Did you speak to your lawyer during the break we just had?
>
> A.  Yes.
>
> Q.  What did you say to him, and what did he say to you?
>
> MR. NADEL: I'm going to instruct you not to answer the question.
>
> . . .
>
> Q.  Did you change your testimony as a result of the conversation you had with counsel?
>
> A:  I changed my testimony because it reminded me what was actually in the contract.
>
> In the contract it says, which I did not even pay attention and I forgot, that in the contract—I mean, I am not a lawyer, and I don't know exactly what is in the contract.  But if it is in the contract, if it says that FoodMatch is not allowed, then it is not allowed is what I am saying.
>
> Q.  Were you shown any documents during the break that we just had?
>
> A.  No, no, I wasn't.
>
> Q.  Was anyone else present with you when you had the conversation with counsel that you just testified to? . . .
>
> A.  Yes. We were in the room, Maia and I and an attorney.
>
> Q.  Mr. Nadel?
>
> A.  Yes. . . .
>
> Q.  Lauren Handel was there as well?
>
> A.  Yes.
>
> Q.  Anyone else?
>
> A.  No.

Q.  Did you discuss any other aspects of your testimony, other than that one answer that you just corrected after the break? . . .

A.  No.

Q.  Were you shown any contractual provision during this break?

A.  No, I was not shown anything on the paper.

Q.  Did anyone suggest any answer to you in terms of this correction?

A.  No. I completely reworded it the other way.

Q.  I'm sorry, what did you say?

A.  I didn't—I was just reminded that there is a clause in the contract that FoodMatch is not allowed to sell anybody else fig spread. And I remember that clause. I was just reminded.  I remember that clause.

Tr. 412:9-4:16-10.

The transcript shows that Chupin spoke to counsel and to his business partner, Maia McGee ("McGee"), during the break and that after the break, he did change his testimony regarding the issue of whether the Distribution Agreement prohibited FoodMatch from selling fruit spread other than Dalmatia's.  Chupin testified that he was "reminded" during the break of the relevant clause in the contract.  Although this reminder was a form of coaching, it is apparent that no further deposition testimony on this point is necessary.  The contract language speaks for itself.  To the extent it somehow could be relevant whether Chupin could remember that provision without a reminder—a dubious proposition at best—the  transcript already establishes that he could not.  It would be unwarranted to bring Chupin back from Croatia to testify further about this issue.

**B.     Alleged Change in Testimony Regarding Whether Products Manufactured by Lancaster that Dalmatia Rejected in November 2015 Were of the Required Quality**

During questioning regarding Dalmatia's decision in November 2015 to reject product produced by Lancaster Fine Foods, Inc. on the grounds of deficient quality, the following exchange took place:

> Q. . . . And on the first page it's an e-mail from you to Jazmine [a Dalmatia employee] November 5, 2015, in which you write, "I understand your concerns, Maia."[4]
>
> . . .
>
> Q. Is that the product that was at–that was produced by Lancaster in late October and early November 2015?
>
> A. I guess it was. This was the product we were tasting, yes.
>
> . . .
>
> Q. And in this document you say, "Remember when we first launched Hermes product, it was more bitter and more black than this and market just swallowed it. I think we are lucky that this product has high tolerance as long as it has few of the points, spreadability, sweetness, and aftertaste."
>
>    Did I read that correctly?
>
> A. Yes.
>
> Q. What does high tolerance mean?  What did you mean by that?
>
> A. It means that we can go—it has a tolerance.
>
> Q. Meaning people will buy it?
>
> A. Well, people will buy it, but . . .
>
> Q. And you go on to say, "and this product you want to stop has all of that."
>
>    Do you see that?
>
> A. Yes.

---

[4]     Chupin directed his email to McGee's employee because he did not have McGee's email address at the time.  Tr. at 284:10-13.

7

> Q.  And the product that was at Lancaster that you were sampling had spreadability, sweetness, and aftertaste, right?
>
> A.  Yes.
>
> Q.  What did you mean by "spreadability"?
>
> A.  Texture.
>
> Q.  Did you check it for medium set?
>
> A.  Yes.
>
> Q.  And did it pass that test?
>
> A.  Yes.

Tr. at 285:9-286:16.

At this point, the deposition was recessed for the evening.  The next day, Chupin gave the following testimony:

> Q.  But based on this tasting, it was passable?
>
> A.  Yes, it was. But you see, I only tasted three jars and Maia was tasting 20 jars a week. So she was much more involved in order to decide if she needed to stop production from Lancaster or not.  At that time, and what I tried, for me this was fine. This was okay to pass. And I even said that it was close, very close. I mean, I exaggerated 99.999, but it was—I would have let it go. I mean, I said that.
>
> Q.  Were you trying to persuade her to continue using Lancaster at this time?
>
> A.  This is the most I've done as far as email.
>
> Q.  I understand. Was this email an effort by you to persuade her to continue using Lancaster to produce fig jam?
>
> A.  Yes, yes. I was trying to change her mind.
>
> . . .
>
> Q.  And did you report to Maia or Jazmine on your opinion when you tried it alone?
>
> A.  Yes. I gave grades and I gave—I gave low grades, and I gave problems with it.  But I said in the email—I haven't seen that email, but I remember I wrote it— that I would let it go for the fourth quarter.

> Q.  Meaning it was acceptable?
>
> A.  When I tried, for me it was—I would let it go.
>
> Q.  What do you mean by "let it go?"
>
> A.  I would let it sell in the fourth quarter.

Tr. 315:15-318:24.

During the course of the deposition, Lancaster's counsel asked Chupin whether he had been consulting with his counsel, Michael Nadel, Esquire ("Nadel"), regarding his testimony during every deposition break.  Chupin stated that he talked with his counsel each time there was a break in the deposition and agreed that there had been breaks approximately every hour and one-half.  Id. 619:14-626:25.  Nadel instructed Chupin not to answer questions regarding whether he asked Nadel how he should testify and what he discussed with Nadel.  Id.

Chupin's testimony after the break is not directly inconsistent with his testimony before the break.  In each case he was implying that while the product was not without fault, he would approve it for sale and that people would buy it.  In the portion of the testimony after the break, to which Lancaster objects, Chupin even said that he was attempting to convince McGee to approve the product for sale.  It could be argued that the subsequent testimony was more negative regarding the product's quality than the former testimony.  It also could be argued that the difference can be explained by the nature of the questions to which Chupin was responding.  What is relevant here is that the testimony is not so different as to show improper coaching by counsel in the interim.  Any difference does not warrant bringing Chupin back from Croatia for additional questioning.

### C.    Alleged Change in Testimony Regarding Whether Dalmatia Informed Third Parties that Lancaster Manufactured Poor Quality Product

During the deposition, Chupin gave the following testimony regarding his

communications with third parties regarding the reason that Dalmatia discontinued Lancaster

Fine Foods, Inc. as its manufacturer:

> Q.  And, in fact, that's what you told people, right?  When they asked you why did the relationship fail, you said because Lancaster failed to meet product parameters, right?
>
> A.  This is what you will say to somebody who would ask you about it, yes.
>
> Q.  And, in fact, that's what you did say, correct?
>
> A.  To whom?
>
> Q.  Well, to people who ask you.
>
> A.  I don't know if—if somebody asked me today or if somebody asked me then why you are not working with Lancaster, I would say because they could not make good enough product to sell.  I would say that.
>
> Q.  And you, in fact, said that to third-parties, correct?
>
> A.  I would say that to the third-parties. But I didn't have—I was not talking to any customers.
>
> Q.  Who were you speaking to?
>
> A.  I was not even speaking about this.  I was all—most of my time is spent on Croatian brand, on issues with the factory, with the distribution in Croatia in the whole world and Europe, on other things I'm doing.

Tr. 541:16-542:17.

After a break, Chupin gave the following testimony in response to redirect questioning by

Nadel:

> Q.  You were asked today about whether you talked to any third-party about why Lancaster isn't making fig spread for Dalmatia anymore.  Do you remember that?
>
> A.  Yes.

10

Q.  And you understand that in this context a third-party means someone who isn't within Dalmatia or Lancaster or FoodMatch, correct?

A.  Yes.

Q.  I want to be clear about this.  Did any third-party even ask you about why the relationship with Dalmatia and Lancaster changed?

A.  No.

Q.  Let's look at Exhibit 61 in your file there. You were asked some questions about this, correct?

A.  Yes.

Q.  Now, take a look at the email and tell me when you have had a chance to read it?

A.  I'm ready.

Q.  In the email, Maia is instructing you about how to talk about what happened with Lancaster, correct?

A.  Yes.

Q.  And do you see the second paragraph that starts with, "Just to let you know?"

A.  Yes.

Q.  What does that say?

A.  "Just to let you know and to be safe legally, do not talk badly to anyone about Lancaster."

Q.  Did you follow that instruction from Ms. Magee?

A.  Yes.

Q.  So you didn't talk badly about anyone—you didn't talk badly to anyone about Lancaster, correct?

. . .

A.  I did not talk badly about Lancaster to anyone.

Q.  And then Ms. Magee says, in the next line, "Anyway, I'm sure you are not." Do you understand [t]hat she means, "I'm sure you are not talking badly to anyone about Lancaster?"

11

. . .

A.  She said that she is sure that I am not because I am not talking to customers anyway.  I am not talking to Atalanta or FoodMatch.  I'm not talking to anyone.

Q.  So she was right that you weren't talking badly to anyone about Lancaster, correct?

A.  Yes, she was right.

Tr. 576:17-579:7 (objections to form omitted).

While it is true that Chupin's initial testimony is somewhat ambiguous, it is not incompatible with his subsequent testimony.  He initially testified that, <u>if someone asked</u>, then he would tell them that Lancaster's product was of poor quality.  He also said, however, he was not talking to any customers and that he was not discussing the subject at all.  In the subsequent testimony, Chupin was more definitive in stating that he was "not talking badly to anyone about Lancaster."  To the extent Lancaster believes this distinction is significant, it may address it at trial.  The distinction is not sufficient, however to show improper coaching and it provides no reason for an additional deposition of Chupin.

**D.**     **<u>Rules Governing Future Depositions in this Action</u>**

In light of the dispute that has arisen between the parties regarding communications with witnesses during breaks in depositions and of the widely-accepted rules on that subject, the Court imposes the following rules for future depositions in this case:

1.  Counsel will not communicate with deponents during breaks regarding the substance of their deposition testimony other than to discuss the assertion of a privilege;

2.  The deposing party may inquire of a witness regarding whether he or she discussed the substance of his or her testimony with counsel during breaks in the deposition; and

3.  If the deponent testifies that he or she did have such discussions with counsel, the deposing party may question the witness regarding the communications with counsel that related to the substance of the deponent's testimony.

An appropriate Order follows.

## **ORDER**

**AND NOW**, this 21st day of October, 2016, upon consideration of the October 17, 2016 letter of Brian A. Berkley, Esquire to the Honorable Marilyn Heffley; the October 17, 2016 email of Brian A. Berkley, Esquire to the Honorable Marilyn Heffley; and the October 19, 2016 letter of Michael S. Nadel, Esquire to the Honorable Marilyn Heffley, **IT IS ORDERED** that:

1.  Lancaster's requests that the Court strike certain deposition testimony given by Ned Chupin, compel a further deposition of him and order that Dalmatia pay the costs of that deposition and the costs incurred by Lancaster in bringing the instant dispute before the Court are **DENIED**; and

2.  Lancaster's request that the Court establish rules regarding communications with deponents during breaks in the course of future depositions in this action is **GRANTED** as follows:

    a.  Counsel will not communicate with deponents during breaks regarding the substance of their deposition testimony other than to discuss the assertion of a privilege;

    b.  The deposing party may inquire of a witness regarding whether he or she discussed the substance of his or her testimony with counsel during breaks in the deposition; and

c.  If the deponent testifies that he or she did have such discussions with counsel, the

    deposing party may question the witness regarding the communications with

    counsel that related to the substance of the deponent's testimony.


                        BY THE COURT:



                        */s/ Marilyn Heffley*
                        MARILYN HEFFLEY
                        UNITED STATES MAGISTRATE JUDGE