IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALMATIA IMPORT GROUP, INC. and MAIA MAGEE, | : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 16-2767 |
| v. | : : | |
| FOODMATCH, INC., LANCASTER FINE FOODS, INC., EARTH PRIDE ORGANICS, LLC, and MICHAEL S. THOMPSON, | : : : : | |
| Defendants. | : | |

### **MEMORANDUM OPINION**

Smith, J.                                                                                                                November 3, 2016

The plaintiffs and defendants were formerly in a seemingly profitable business relationship which, for eight years, brought the unique pleasures of high-quality fig jam to discerning consumers throughout the United States and Canada. Last year, that relationship deteriorated, quickly and inexorably, leading the defendants to bring to market a competing brand of fig jam. In the midst of the fallout, the defendants also produced and/or sold quantities of the plaintiffs' brand of fig jam to fill existing purchase orders, but did so without the plaintiffs' permission.

This matter is scheduled for trial on an expedited basis in January 2017. In the interim, the plaintiffs bring two motions for preliminary injunction against the defendants. The first seeking to enjoin production of the defendants' rival jam by enforcing a contractual noncompetition clause against the manufacturing defendants. In the other, the plaintiffs seek to enjoin the defendants from producing or distributing any further plaintiff-brand fig jam, verified through inspections, and require a recall of any unauthorized product currently on store shelves.

For reasons more fully set forth below, the court must properly deny both motions largely because the limited record before the court either prevents the court from finding a substantial likelihood of success on the merits or from ordering the relief requested by the plaintiffs.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The plaintiff, Dalmatia Import Group, Inc. ("Dalmatia"), is a Florida corporation that specializes in a high quality fig jam, known as "fig spread," that is sold (often with cheese products) in grocery stores of a certain cachet.[1]  Complaint ("Compl.") at ¶ 14; Lancaster Counterclaims ("Counterclaims") at ¶ 5.  The defendants are Lancaster Fine Foods, Inc. ("Lancaster") and Foodmatch, Inc. ("Foodmatch"), companies that specialize in food manufacture and distribution, respectively.[2]  Compl. at ¶¶ 15, 16; Counterclaims at ¶ 4; Foodmatch Answer ("Answer") at ¶ 15.  By 2008, the parties formed a food triumvirate, enjoying great success by making and selling Dalmatia's signature fig spread.  *See* Distribution Agreement, Doc. No. 1-104; Declaration of Michael S. Thompson ("Thompson Decl."), Ex. B ("Supply Agreement"), Doc. No. 1-70;[3] Dalmatia's Motion for Preliminary Injunction for Breach of Contract, ("Breach Motion"), Ex. D, Doc. No. 1-44.[4]

The general business model was as follows: Lancaster manufactured the spread to precise specifications devised by Dalmatia, and then sold it to Dalmatia; Dalmatia then sold the spread to Foodmatch which, with its customer list and business infrastructure, distributed the spread to

---

[1] Maia Magee, the 50% owner of Dalmatia, is also a plaintiff.  Dalmatia, however, is the only moving party with respect to the preliminary injunctions.
[2] EarthPride Organics, LLC ("EarthPride"), Lancaster's parent company, and Michael S. Thompson, Lancaster's CEO, are also named defendants.  Because the conduct that is the subject of the preliminary injunctions is primarily that of Lancaster, EarthPride and Thompson are mentioned throughout this opinion only to the extent their conduct is relevant or necessary.
[3] The full exhibits to the Thompson declaration have not yet been transferred to the court's docket.  They are still available on the docket for the Southern District of New York, Civil Action No. 16-933, Doc. No. 76.
[4] The full exhibits to the Breach Motion have not yet been transferred to the court's docket.  They are still available on the docket for the Southern District of New York, Civil Action No. 16-933, Doc. No. 51.

2

grocery stores throughout the country. *See* Declaration of Maia Magee, Trademark Motion, ("Magee Decl.") at ¶ 12, Doc. No. 1-39.

When Dalmatia initially contracted for the manufacture of its fig spread back in 2006, it was not with Lancaster, which did not exist at the time, but instead with Beanies of Lancaster ("Beanies"). *See* Supply Agreement. Beanies, like Lancaster, was a food manufacturer. *See id.* Companies or other entities would provide Beanies with certain recipes or other specifications, and Beanies would manufacture that food product pursuant to those specifications. *See* Thompson Decl., Ex. A, Asset Purchase Agreement ("APA").[5]

Because Beanies would necessarily have Dalmatia's proprietary information, including Dalmatia's fig spread recipes, the contract included a noncompetition clause, which provided that:

> "(a) During the Term of this Agreement and for a period of two years thereafter or, upon the termination of this Agreement by Beanies for a period of two years thereafter (the "Noncompetition Period"), Beanies shall not make, manufacture, process, test, label, store, and/or sell the Product or any similar competitive fig spreads on its own account or for any customer in any manner or conduct any business which is in any way competitive with [Dalmatia] in the Territory (the "Noncompetition Restrictions")[.]"

Supply Agreement at 2.8.

Shortly before executing that contract, Beanies had entered into an Asset Purchase Agreement ("APA") with EarthPride. *See* APA. The APA provided that EarthPride would purchase, and Beanies would deliver, "all of [Beanies'] assets used in the Business (collectively, the "Acquired Assets"), free and clear of all liens and encumbrances of any kind whatsoever" and that the "Acquired Assets constitute all of the assets necessary to conduct the Business[.]" *Id.* at 1.1. The APA also referenced Schedule 2.6, which purported to be a "list of all the

---

[5] *See*, *supra*, note 3.

contracts and agreements . . . pertaining to the Business to which [Beanies] is a party[.]" *Id.* at 2.6. Schedule 2.6 listed four contracts: a facility lease, a copier maintenance contract, a lift truck maintenance contract, and a pest control contract. *Id.*, Ex. A. None of those contracts directly pertained to the manufacture of food pursuant to confidential recipes. *See id.*

Shortly after the Beanies-Dalmatia contract, EarthPride and Beanies closed on the APA. *See* APA; Thompson Decl. at ¶ 9. EarthPride then incorporated Lancaster, which began essentially operating what was formerly Beanies. *Id.* at ¶ 15. In fact, Lancaster sent Dalmatia a letter stating: "I want to announce that Lancaster Fine Foods, Inc. has acquired the assets of Beanies of Lancaster. This is a continuation of a process that was begun in this past spring to invigorate a quality factory and its dedicated staff through new management and investment. . . . We look forward to building a successful relationship with each and every one of our customers." Breach Motion, Ex. D. Lancaster's invoices to Dalmatia also, for a time, bore Lancaster's name, but Beanies' email address and website. *See* Magee Decl., Breach of Contract ("Magee Breach Decl."), Ex. C, Doc. No. 1-47.[6]

For approximately the next seven years, the parties enjoyed profits, and consumers enjoyed a high quality fig spread. *Cf.* Thompson Decl. at ¶ 23. But, and for reasons that are in dispute, friction developed in the summer of 2015. *Id.* at ¶ 23, 36; Magee Decl. at ¶¶ 14-17. Dalmatia began voicing concerns about the quality of some of Lancaster's production batches, and Lancaster, for its part, became frustrated with those concerns given that it was producing fig spread that it believed met the applicable specifications. *See* Thompson Decl. at ¶¶ 36-39; Magee Decl. at ¶¶ 14-17.

---

[6] The full exhibits to the Magee breach declaration have not yet been transferred to the court's docket. They are still available on the docket for the Southern District of New York, Civil Action No. 16-933, Doc. No. 41.

Then, in the fall of 2015, things fell apart quickly. With the holiday season approaching, demand for fig spread increased. Dalmatia placed several large, expedited orders for fig spread with Lancaster, based upon certain purchase orders Dalmatia received from Foodmatch. *See* Thompson Decl. at ¶ 39. In total, Dalmatia placed orders for six truckloads of fig spread. *See* Thompson Decl. at ¶¶ 39-40, Ex. N. Lancaster produced two, which passed an initial inspection, but failed a final quality inspection by Dalmatia. Magee Decl. at ¶ 17. Dissatisfied with the quality, Dalmatia issued a stop work order to Lancaster. *Id.* Dalmatia also informed Foodmatch that, because of Dalmatia's issues with the quality of production, it was "halting production" at Lancaster and moving production to another entity. Thompson Decl. at ¶ 45, Ex. S. Dalmatia also "apologize[d] [to Foodmatch] for any gap in stock which this decision may cause you." *Id.*

Foodmatch responded to Dalmatia's notice that it was ceasing production by informing Dalmatia that it considered Dalmatia's actions in ceasing production (and refusing to release multiple truckloads of product for shipment) to be "a blatant breach of [Dalmatia's] obligations under the [parties'] Agreement." Affidavit of Philip Meldrum ("Meldrum Aff."), Ex. P, Doc. No. 1-74.[7] Lancaster, which believed its manufactured product was store-ready, responded to the stop work order by informing Dalmatia that Dalmatia had not acted in good faith and that its public dissemination of Lancaster's purported product quality issues was baseless and defamatory. Thompson Decl. at ¶ 44, Ex. R. In order to satisfy the outstanding purchase orders, Foodmatch and Lancaster went forward with the production without Dalmatia's permission, and sold the fig spread, still bearing Dalmatia's marks, to Foodmatch's customers. *See* Thompson Decl. at ¶ 53. After filling those orders, Lancaster still had a substantial amount of Dalmatia product in its inventory, including unsold fig spread, jars, and labels. *See* Thompson Decl. at ¶

---

[7] The full exhibits of the Meldrum affidavit have not yet been transferred to the court's docket. They are still available on the docket for the Southern District of New York, Civil Action No. 16-933, Doc. No. 80.

61. But Foodmatch and Lancaster abandoned manufacturing and marketing Dalmatia brand fig spread. *See* Supplemental Decl. of Michael S. Thompson at ¶¶ 5-7, Doc. No. 26-2. Instead, Foodmatch and Lancaster agreed to work together to develop a different fig spread, under Foodmatch's product line, "Divina."[8] *See* Thompson Decl. at ¶ 30.

The 2015 disintegration of this business relationship triggered rather tenacious litigation across two fora. The procedural history is well-known to the parties, and largely unnecessary for the disposition of these motions. Of relevance, Lancaster sued Dalmatia and Maia Magee in Pennsylvania state court for, *inter alia*, breach of contract, for wrongfully rejecting the holiday production line, which Dalmatia subsequently removed to this court. Civil Action No. 16-182, Doc. No. 1. Dalmatia sued Lancaster (among others) in the Southern District of New York for, *inter alia*, violating the noncompetition clause by producing Divina.[9] *See* Doc. No. 1-28. Dalmatia also brought claims of counterfeiting and trademark violation against all defendants arising under the Lanham Act based upon the production and sale of the unauthorized holiday production line. *Id.* Dalmatia moved for preliminary injunctions on its claims, asking for an order enjoining the production of Divina or unauthorized Dalmatia fig spread, returning to Dalmatia its product currently held by Lancaster, and requiring Lancaster to recall the holiday line product currently on the shelves. Doc. Nos. 30, 32.

With motions pending, Lancaster, in April 2016, offered to return its remaining Dalmatia inventory. *See* Thompson Decl. at ¶ 61. The parties engaged in extensive negotiations over the next few months, without reaching an agreement. *See* Declaration of George Krueger, Doc. No. 26-3. While both parties agreed that the inventory should return to Dalmatia's possession,

---

[8] At or around this time, and the exact details are in dispute, Dalmatia began manufacturing its signature spread on its own and engaged a separate distributor to get the product to the shelf.

[9] On June 1, 2016, upon the parties' agreement, the United States District Court for the Southern District of New York transferred the case to this court. *See* Doc. No. 1 at ECF pp. 19-20; Doc. No. 1-101.

Dalmatia refused to withdraw its motion for preliminary injunction unless Lancaster consented to a court order that it would never again produce Dalmatia fig spread, as well as agree to an inspection of its facilities to ensure that all product was returned.  *Id.*

The court scheduled an evidentiary hearing, but at the parties' request, converted that hearing into oral argument, with the matter to be decided on the written submissions, with minimal additional discovery.  Civil Action No. 16-182, Doc. No. 49.  The parties submitted additional briefing on narrow issues following the argument.  Doc. Nos. 37, 40, 44.

## II.     LEGAL STANDARD

"Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Checker Cab of Philadelphia Inc. v. Uber Techs., Inc.*, No. 15-1834, 2016 WL 929310, at *1 (3d Cir. Mar. 10, 2016) (internal citations and quotations omitted).  In order to secure a preliminary injunction, the moving party must establish its entitlement to such relief by clear evidence on the merits of its claim.  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

Courts can grant a preliminary injunction only if the following four factors all weigh in favor of such relief: (1) the likelihood that the movant will succeed on the merits; (2) the extent to which they will be irreparably harmed without the relief requested; (3) the extent to which the other parties will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117 (3d Cir. 2013) (citing *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1438 (3d Cir. 1994)).

"[I]n injunction cases, the cessation of the conduct complained of makes the case moot if subsequent events make it clear that the wrongful behavior could not reasonably be expected to recur."  *New Jersey Turnpike Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir.

1985). And when injunctive relief is appropriate, courts should still be "reluctant to grant an injunction any greater in scope than is absolutely necessary[.]" *Brennan by Brennan v. Sch. Dist. of Philadelphia*, No. 88-6869, 1988 WL 96798, at *6 (E.D. Pa. Sept. 16, 1988).

### III.   ANALYSIS

#### A.   <u>Noncompetition Agreement</u>

Without a determination that the moving party is likely to succeed on the merits, the court cannot issue a preliminary injunction. *See Lanin*, 515 F. App'x at 117. Because disputed material facts prevent the court from, on this record, finding a substantial likelihood of success on the merits, the court is precluded from granting a preliminary injunction with respect to the noncompetition agreement.

The parties dispute whether the Beanies-Dalmatia agreement even applies to Lancaster, but the court would have to deny the preliminary injunction in either case. Lancaster argues that Dalmatia wrongfully rejected goods Lancaster produced, at the busiest time of the year, causing substantial financial distress to Lancaster and without allowing Lancaster an opportunity to cure. If true, this may be a material breach, as argued by Lancaster, *see* Lancaster Proposed Findings of Fact and Conclusions of Law, at 41, Doc. No. 28), and accordingly, Lancaster may be able to avoid its responsibilities under the contract, including the non-compete clause. *See Protege Software Servs., Inc. v. Colameta*, Civil Action No. 09-03168, 2012 WL 3030268 (Mass. Super. 2012) (Kirpalani, J).[10]

Based on the existing evidentiary record, the court cannot reasonably conclude that Dalmatia is substantially likely to succeed on the merits with respect to this claim. The issue of the propriety of Dalmatia's rejection of goods is a central element in this case, hotly disputed by both parties, and the primary claim of Lancaster's first-filed suit. The parties have submitted

---

[10] The parties agree that contract is governed by Massachusetts law.

competing declarations, and the lack of additional evidence in the record before the court makes it difficult to determine the credibility and accuracy of the affidavits or resolve the disputed facts included within the declarations. No party has presented quantifiable evidence of any testing of the rejected goods to demonstrate whether or not they fell within the required specifications, or evidence that the consumers noticed any difference. In short, the answer to the legal issue of whether Dalmatia's rejection of goods was wrongful is so highly fact-specific, that it would be improper for the court to grant the requested preliminary injunctions on the limited factual record available.

### B. <u>Lanham Act</u>

The preliminary relief Dalmatia seeks for its claims arising under the Lanham Act essentially falls into two categories: (1) preventing Lancaster from selling or producing any future, unauthorized Dalmatia product and (2) recalling the unauthorized product already sold. For the first category, the court finds that subsequent actions by the parties have largely rendered the requested relief moot. For the second category, the court finds that, based on the record currently before the court, a recall would be inappropriate even if Dalmatia is likely to succeed on the merits.

#### 1. **Preventing Future Unauthorized Production**

Dalmatia asks the court to enjoin Lancaster from further production of unauthorized Dalmatia product, to require Lancaster to return existing Dalmatia product, and to require Lancaster to submit to inspections to verify compliance. These requests appear to be largely mooted.

First, Lancaster has not manufactured or sold Dalmatia product since December 2015, and categorically denies that it will ever do so again. While a promise to cease the offending

conduct is not always enough, standing alone, to moot a request for injunctive relief, there is no reason to doubt Lancaster's claims here. *See Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 239 (3d Cir. 2003) (no injunction necessary where the defendant was unlikely to continue to sell infringing products). Since December 2015, after fulfilling outstanding purchase orders, Lancaster ceased selling its Dalmatia fig spread inventory to Foodmatch, despite having additional product on hand.

Immediate, voluntary cessation of alleged infringement has persuaded other courts that the offending party is not likely to continue infringement and, accordingly, that injunctive relief is inappropriate. *See id.* at 236. This is, no doubt, the exception, rather than the rule. *See id.* at 248 (Rosen, J. dissenting) (citing *Lyons P'ship, LP v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001)). But the court is convinced here that "an injunction is unnecessary [because] there is no reasonable expectation that the wrong will be repeated." *Lyons*, 243 F.3d at 800 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)) (quotations omitted). The motivation driving that unauthorized production and sale is no longer present. Foodmatch and Lancaster have no outstanding purchase orders of Dalmatia product to fill. There is no plausible reason to suspect that Lancaster has or will secretly continue making and selling Dalmatia fig spread under Dalmatia's marks. Indeed, doing so would be counterproductive to Lancaster's goal of establishing the Divina brand, should it ultimately have a legal right to do so. It would be illogical for Lancaster to divert its limited resources away from producing Divina so that it may generate counterfeit Dalmatia brand products.

Second, as to the inventory on hand, Lancaster has offered several times to return it to Dalmatia in a time and manner of Dalmatia's choosing. Recently, the parties appeared to make some progress in resolving this issue without the court's involvement. Talks stalled over

Dalmatia's request for inspection rights and a stipulation that Lancaster would not infringe on Dalmatia's marks. Dalmatia wanted the certainty of inspections and the enforceability of a court stipulation; Lancaster did not want a document that could be perceived in the food industry as an admission of wrongdoing. But the parties all agree that the product should leave Lancaster's hands and return to Dalmatia. There is no need for a court order for this to happen. *See McCoy v. Edmeister*, No. 14-CV-1379-NJR-DGW, 2015 WL 2330235, at *3 (S.D. Ill. May 14, 2015) (adopting report and recommendation and finding motion for injunction moot when the movant had the materials he requested returned to him).

For the same reasons that Lancaster is unlikely to continue selling Dalmatia fig spread, inspections of Lancaster's facilities are unnecessary. There is no reason to believe that the complained of acts are likely to recur. Injunctions are to prevent prospective harm, and are generally inappropriate for past harm. *See New Penn Fin., LLC v. Giglio*, No. CIV A. 16-1827, 2016 WL 4124001, at *2 (E.D. Pa. Aug. 3, 2016) ("The purpose of injunctive relief is to prevent future harm, not to punish past conduct." (citing *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980)). The harm complained of here is more appropriately addressed through damages, absent any indication that the conduct is likely to recur. Lancaster wants to, and has offered to, return Dalmatia's inventory. Dalmatia has agreed to pick it up. There is no need for the court to order injunctive relief to make this happen.[11]

### 2. Recall

Last is the issue of the recall. This request is not mooted by Lancaster's ceasing to produce and sell Dalmatia fig spread. These jars are on store shelves now. But while injunctions are extraordinary remedies, recalls are "something more than a prohibitory preliminary

---

[11] None of this analysis reflects on the merits of Dalmatia's claims under the Lanham Act; it only goes to whether the requested equitable relief is appropriate here.

injunction" and require more careful consideration by the court. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (adopting the Third Circuit test for determining whether to order a recall). On this record, a recall would be inappropriate.

Because this case originated in the Southern District of New York before its transfer to this court, the court will "apply Third Circuit law as binding precedent, although it will give 'close consideration' to the law of the [Second] Circuit, the transferor circuit, as appropriate[.]" *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 484 (E.D. Pa. 2000); *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.8 (3d Cir. 1993) (assuming without deciding that the district court correctly considered the law of the transferor circuit).

### a. Third Circuit Law

When considering whether to order a recall, courts must consider "1. the willful or intentional infringement by the defendant; 2. whether the risk of confusion to the public and injury to the trademark owner is greater than the burden of the recall to the defendant; and 3. substantial risk of danger to the public due to the defendant's infringing activity." *Gucci Am., Inc. v. Daffy's, Inc.*, 354 F.3d 228, 233 (3d Cir. 2003). A recall falls under the category of a "mandatory injunction," which are "preliminary injunctions [that] disturb, rather than preserve the status quo, [and as such,] are particularly disfavored." *Dorsey v. Black Pearl Books, Inc.*, Civil Action No. 06-2940, 2006 WL 3327874, at *12 (D.N.J. Nov. 14, 2006).

Regarding the first factor, while the initial production and sale was certainly willful, the combination of Lancaster's financial distress and the immediate cessation following the fulfillment of the outstanding purchase orders somewhat mitigates the weight that the court will give this factor. Accordingly, the court weighs it only slightly in favor of a recall.

Concerning the second factor, the court takes seriously the risk of confusion to the public and injury to the trademark owner. The public purchasing these unapproved Dalmatia products almost certainly believe that they are purchasing approved Dalmatia fig spread, and loss of quality control is injurious to Dalmatia.[12] But there is no indication that the loss of quality control, as to these products, is inflicting actual harm to Dalmatia or its brand. The fact that customers did not get Dalmatia-approved product does not, on its own, justify the ordering of a recall. *Gucci Am., Inc.*, 354 F.3d at 234.[13] If the product on the shelves is materially the same as Dalmatia product, as Lancaster claims (and which is circumstantially supported by the absence of any customer complaints), the only harm to Dalmatia is financial—that is, it should have earned money from these sales. That is an issue resolved by damages, not injunctive relief. And though no party has put forward direct evidence of the harm imposed on the defendants due to a recall, the court can infer that it would be substantial, given the scope of the distribution network. So after careful consideration, the court cannot say the harms of not recalling the product outweigh the harms imposed by a recall.

As for the final factor, there appears to be no risk at all to the public posed by the unauthorized fig spread. Dalmatia's allegations go to quality, not safety. There are no complaints of any kind regarding the product. If the court found "the infringing product causes a

---

[12] At the same time, it is not at all clear that a recall would not be even more injurious to Dalmatia. Further, the court finds that while loss of quality control amounts to irreparable harm for the purposes of determining whether any injunctive relief is warranted, such as enjoining a party from selling infringing products, it does not necessarily constitute harm so severe that the "extreme remedy" of a recall is warranted. *Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, No. CIV A. 12-5423, 2015 WL 150756, at *4 (S.D.N.Y. Jan. 12, 2015).

[13] The court's analysis is not changed by the fact that, in *Gucci*, the plaintiff waived arguments based on quality control, rather than actual quality, because they were raised for the first time on appeal. While noting that it would not consider those arguments, which Dalmatia raises here, the Third Circuit noted that "[i]n any event, the record lacks any evidence that Daffy's handbags were of significantly inferior quality or even readily distinguishable from Gucci's." *Gucci Am., Inc.*, 354 F.3d at 249 n.3. The court finds that reasoning persuasive here. While quality control may constitute irreparable harm sufficient to prohibit a party from continuing ongoing infringement, it does not on its own compel the court to issue a recall when the record lacks evidence that would allow this court to find that the product is "of significantly inferior quality or even readily distinguishable[.]" *Id.*

substantial risk of danger to the public," it would "order a recall." *Marlyn Nutraceuticals*, 571 F.3d at 879. Such is not the case here.

In sum, after considering the factors deemed relevant by the Third Circuit, the court finds that, on balance, a recall would be inappropriate based on the available factual record.

### b.   Second Circuit Law

As mentioned above, the court will also give special consideration to Second Circuit law. *In re Ikon*, 86 F. Supp. 2d at 484. In the Second Circuit, "[i]n deciding whether to order a recall, a court should consider the defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order." *See Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 414 (S.D.N.Y. 2011).

Consideration of these factors weighs more heavily against ordering a recall for the following reasons: First, the record before the court does not compel the conclusion that Lancaster acted in bad faith. Lancaster represents that the product it manufactured was within specification, and that Dalmatia wrongfully rejected it. Lancaster argues that it acted to mitigate its damages caused by the breach and, subsequent to the minimal action necessary to mitigate these damages, Lancaster ceased production. While those factors may or may not be relevant in determining whether Lancaster violated the Lanham Act, they are highly relevant in determining whether Lancaster acted in bad faith. As such, this factor weighs against a recall.

Second, while Lancaster and Foodmatch profited from the sales, as stated earlier, that is more appropriately addressed through damages. There is no indication that any of the customers were permanently diverted from Dalmatia to Lancaster. If the product is what customers expect

from Dalmatia fig spread, as Lancaster contends, then these customers are likely to remain loyal to the Dalmatia brand.  That could change if, as Dalmatia contends, the product was substandard.  Customers who are dissatisfied with Dalmatia may become more inclined to try Divina or another competitor.  But the only evidence the court has that the product was deficient is a declaration from Dalmatia, and there are declarations by the defendants vigorously disputing this point.  It is difficult for the court to make a factual finding on the basis of equally plausible, conflicting declarations.  There is no analysis of the sold jars or evidence of customer dissatisfaction.  Accordingly, this factor also weighs against a recall.

Third, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs appears likely to be substantial, but no party has submitted evidence sufficient for the court to comprehensively analyze this factor.  Based on the current record, it appears that jars from the batch appear in grocery stores in many states, and there are over 200,000 jars on the market, all facts suggesting that the costs would be substantial.  With this limited record, together with reasonable inferences, this factor weighs slightly against a recall.

Lastly, it does not appear that a recall will benefit Dalmatia, and it may in fact have the opposite effect.  A recall of Dalmatia product, by its very nature, will likely cause harm to Dalmatia's brand, no matter how the recall is handled.  Merchants and customers will necessarily be involved, and the obvious conclusion to be drawn is that the product is defective.  But most importantly, there is simply insufficient evidence in the record relating to the quality of the unauthorized product.  If the product were manifestly deficient, a recall may well be appropriate.  But there is no analysis demonstrating its deficiencies, and no record of *any* customer complaints relating to these unauthorized jars.  The court is therefore disinclined to order a recall under these circumstances.

In sum, if the court found that Dalmatia was likely to succeed on the merits of its Lanham Act claims, the injunctive relief requested would still be inappropriate, and the court would decline to order it. Two of the claims are mooted by the parties' conduct; the other is an "extreme remedy" that the court would find inappropriate based on the current record submitted by the parties. *See Audemars*, 2015 WL 150756, at *4 (S.D.N.Y. Jan. 12, 2015).

The court recognizes that this evidentiary record was prepared on an expedited basis, but the court cannot relax the standard for issuing preliminary injunctive relief on that basis. Because the requested relief is not warranted, the court does not need to analyze the merits of the Lanham Act claims at this juncture. *Cf. McCoy v. Edmeister*, No. 14-CV-1379-NJR-DGW, 2015 WL 2330235, at *3 (S.D. Ill. May 14, 2015) (adopting report and recommendation which declined to further consider the merits of the plaintiff's request for preliminary injunctive relief" when the relief the plaintiff sought was already made available to him); *Booker v. O'Conner*, 2015 BL 84227, 2 (N.D. Ill. Mar. 26, 2015) (declining to address "the merits of plaintiff's individual claims" when the requested relief is inappropriate); *Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir. 1993) (declining to remand to the administrative board to reconsider the merits when it had "plainly stated" that it would not grant relief in the exercise of discretion even if applicant were eligible).

### III.   CONCLUSION

The parties are engaged in intense litigation over a very real and profound dispute, the outcome of which may determine which business enterprises survive. While there is much at stake, the facts necessary to resolve this dispute are properly determined by a jury. Accordingly, and for the reasons stated above, the extraordinary relief afforded by a preliminary injunction is

not warranted on the limited, contested record before the court.  Therefore, the court will deny the motions by separate order.

                BY THE COURT:


                /s/ *Edward G. Smith*
                EDWARD G. SMITH, J.