IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALMATIA IMPORT GROUP, INC., and MAIA MAGEE, | : |
| Plaintiffs, | : CIVIL ACTION NO. 16-2767 |
| v. | : |
| FOODMATCH, INC., LANCASTER FINE FOODS, INC., EARTH PRIDE ORGANICS, LLC, and MICHAEL S. THOMPSON, | : |
| Defendants. | : |

**DALMATIA'S BRIEF IN OPPOSITION TO
FOODMATCH'S MOTION FOR SUMMARY JUDGMENT**

Citing *no law whatsoever*, FoodMatch seeks an order granting partial summary judgment on a portion of Count II of Dalmatia's complaint, which alleges that the Dalmatia/FoodMatch Distribution Agreement prevents FoodMatch from selling a competing fig spread after the termination of the Distribution Agreement. FoodMatch also seeks an order granting summary judgment on Count III of Dalmatia's complaint, which alleges that FoodMatch breached its Non-Disclosure Agreement.

FoodMatch's motion should be denied as to both counts. The plain language of both the Distribution Agreement and the Non-Disclosure Agreement is controlling, and FoodMatch is incorrect as to each contract's meaning as a matter of law. To the extent it is necessary to look beyond the plain language of the agreement, there are—at a minimum—genuine disputes of material fact that preclude summary judgment for FoodMatch.

**I.      FOODMATCH'S NON-COMPETITION OBLIGATION IS NOT LIMITED TO THE TERM OF THE DISTRIBUTION AGREEMENT.**

In 2006, Dalmatia and FoodMatch executed the Distribution Agreement, which is attached as Exhibit A to FoodMatch's motion. Dalmatia's first claim for breach of contract

(Count II) alleges that FoodMatch breached the distribution agreement.  FoodMatch breached numerous provisions, including:

- Paragraph 1(c), which provides:  "FoodMatch agrees that during the Term of the Agreement, it will not sell or promote in the Territory any competitive products that are similar to the Products."  FoodMatch promoted Divina fig spread, Divina orange fig spread, and Ficoco (cocoa fig spread) during the term of the Distribution Agreement.

- Paragraph 1(e), which provides:  "FoodMatch agrees that it will not manufacture, purchase, or sell products in the Territory that compete directly with the Products."  Unlike Paragraph 1(c), Paragraph 1(e) is not limited to the term of the agreement.  FoodMatch purchased and sold Divina fig spread, Divina orange fig spread, Ficoco, *and* counterfeit Dalmatia fig spread both during and after the term of the agreement.  FoodMatch also contracted with Lancaster Fine Foods and a Greek company for the manufacture of Divina fig spread and Ficoco during and after the term of the agreement.

- Paragraph 7(a), which provides:  "All use of Dalmatia's Marks by FoodMatch and Dalmatia shall inure solely to the benefit of the owners of such rights in said intellectual property."  FoodMatch used Dalmatia's trademarks solely to benefit itself by selling the counterfeit Dalmatia fig spread without any compensation to Dalmatia.

- Paragraph 7(c), which provides: "[N]or shall FoodMatch perform any act which would be inconsistent with any of Dalmatia's Marks or Intellectual Property or Dalmatia's ownership thereunder."  FoodMatch performed acts inconsistent with Dalmatia's marks and its intellectual property by selling the counterfeit fig spread under Dalmatia's marks and by using Dalmatia's trade secrets with respect to Divina fig spread.

- Paragraph 8(b)(i) provides: "In the event of termination of this Agreement for any reason, . . . FoodMatch shall cooperate with Dalmatia to provide for an orderly transfer and continuity of the sale and services of the Products." Instead, FoodMatch moved to destroy the sales of Dalmatia fig spread by switching customers over to its own competitive Divina fig spread.

FoodMatch's motion addresses *only* Dalmatia's allegations with respect to the non-competition clauses, and *only* as to FoodMatch's conduct <u>after</u> the termination of the Distribution Agreement.

The parties agree that Paragraph 1(c)'s non-competition language is limited to "the term of this Agreement." That is what the plain language of the Distribution Agreement provides. The parties *disagree* regarding Paragraph 1(e)'s non-competition language. Paragraph 1(e) contains no language limiting its non-competition language to the Term of the Agreement. It is open-ended. FoodMatch, however, contends that it is entitled to partial summary judgment because "paragraph 1(e) does not state that it is unlimited in time." *Feldman Affidavit* ¶ 5. That is exactly what Paragraph 1(e) states, however, because it contains no time limitation. FoodMatch identifies no authority suggesting that a court will rewrite an agreement to include a missing time limitation or read in a time limitation where there is none. There is no such authority. To the contrary, under the venerable maxim *expresio unius est exclusio alterius*, if parties to a contract omit terms, under New York law,[1] a court will not find such terms are implied. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014).

FoodMatch argues that Dalmatia's "construction" of Paragraph 1(e) would "negate and render meaningless Paragraph 1(c). " *Id.* ¶ 7. Dalmatia is not "construing" Paragraph 1(e). Dalmatia is applying its plain language. *FoodMatch* is "construing" it by *adding* a phrase—

---

[1] Pursuant to Paragraph 13, the Distribution Agreement is governed by New York law.

3

"during the Term of this Agreement"—*that is not there*.  In any event, FoodMatch is wrong. Paragraphs 1(c) and 1(e) are not redundant.  They employ different language:

> 1(c): "FoodMatch agrees that *during the Term of the Agreement*, it will not sell or promote in the Territory any competitive products that **are similar to the Products**."
>
> *vs*.
>
> 1(e): "FoodMatch agrees that it will not manufacture, purchase, or sell products in the Territory that **compete directly with the Products**."

<u>Read together</u>:  *During* the Term of the Agreement, FoodMatch cannot sell products that are even *similar* to Dalmatia's products, nor can it manufacture, purchase or sell products that *compete directly* with Dalmatia's products.  *After* the Term of the Agreement, FoodMatch **can** sell products that are *similar* to Dalmatia's products (jams, generally, for example) but **still cannot** manufacture, purchase or sell products that *compete directly* with Dalmatia's products (fig spread, orange fig spread, and cocoa fig spread).  Paragraph 1(c), which has a broader scope, applies only during the Term, while the narrower restriction of Paragraph 1(e) applies both during and after the Term.[2]

**Thus, Dalmatia reads Paragraph 1(c) and 1(e) in harmony**.  The Court must do so as well.  *See Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002)

---

[2] It makes sense that the non-competition restriction of Paragraph 1(c) would apply to promotion and sales of all similar Products during the Term because that Paragraph relates to FoodMatch's obligations to use "best efforts to promote the sales of the Products in the Territory." Those best efforts obligations end with the termination of the Agreement as FoodMatch's distribution rights apply only during the Term. *Distribution Agreement* ¶ 1(a). In contrast, Paragraph 1(e)'s more limited restriction against direct competition would be relevant both during and after the contract Term.  And, in addition to making sense, Dalmatia's plain reading has the virtue of being *exactly what the language of the Distribution Agreement provides*.

("General canons of contract construction require that where two seemingly-conflicting provisions reasonably can be reconciled, a court is required to do so and give both effect."). In contrast, *FoodMatch's* position would negate and render the "sell" restrictions of Paragraph 1(e) meaningless. If, as FoodMatch contends, Section 1(e)'s "sell" restriction is limited to the Term of the Agreement, why is it in the Agreement at all? Why isn't that already covered by Section 1(c)? FoodMatch has no answer. And without an answer, FoodMatch cannot win. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not perferred and will be avoided if at all possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."). FoodMatch references, without citation, "a well-settled principle of law that a specific provision prevails over a general provision." But Paragraph 1(c) is no more specific than Paragraph 1(e). In Paragraph 1(c), the parties included language limiting the restriction's duration, and in Paragraph 1(e), the parties omitted that limiting language. "The inescapable conclusion is that the parties intended the omission." *Canon, Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 578 (S.D.N.Y. 2015). FoodMatch's motion must fail as a matter of law.

Unable to rely on the language of the Distribution Agreement or a single decision of any court, FoodMatch relies on its misinterpretation of the parties' conduct. FoodMatch writes: "In addition, Ms. Magee and Mr. Chupin, the two shareholders of Dalmatia, have always acted consistent with the view that FoodMatch could and would sell a competing product after the term of the Distribution Agreement ended." *Feldman Affidavit* ¶ 8. That is only half correct, however. "Could" and "would" are two different things. Ms. Magee and Mr. Chipin have long believed that FoodMatch *would* sell a competing product if they did not continue the distribution

relationship—*and they were right*. But there is *no evidence* that they believed FoodMatch *could* legally do so—just that FoodMatch *would* do so and might get away with it, which, so far, is what has happened. FoodMatch quotes Mr. Chupin's deposition testimony, but it is of no help. As shown in Paragraph 9 of the Feldman Affidavit, Mr. Chupin testified that he and Ms. Magee were always concerned that FoodMatch would come out with a competing jam, because FoodMatch CEO Phil Meldrum had threatened that he would. Mr. Chupin never told Mr. Meldrum he could not do that, because Mr. Chupin was "afraid." *Feldman Affidavit* ¶ 9. This year's events have vindicated that instinct. Likewise, the email from Ms. Magee and Ms. Magee's deposition testimony both establish that FoodMatch *would* attempt to come out with a copy of Dalmatia fig spread—*not* that FoodMatch was permitted to do so. Ms. Magee has always believed that the Distribution Agreement means what it says. *Magee Dec.* ¶ 3. There is a complete *absence* of evidence that *anyone* actually believed that Distribution Agreement permitted FoodMatch to lawfully sell a directly competing product. The fact someone *does* something is not evidence he believed in good faith that he had a right to do so. Thus, *at a mimimum*, there is a dispute of fact regarding whether Section 1(e) can be breached after the Term of the Agreement.

## II.  THE NON-DISCLOSURE AGREEMENT IS NOT LIMITED TO INFORMATION PROVIDED DIRECTLY BY DALMATIA.

In 2007, FoodMatch and Dalmatia entered into the Non-Disclosure Agreement. FoodMatch contends that the Non-Disclosure Agreement "only pertains to information provided by Dalmatia to FoodMatch." *Feldman Affidavit* ¶ 15. FoodMatch is incorrect. The Non-Disclosure Agreement defines the term "Information" in Section 1(a) to mean

> any confidential and/or proprietary information of [Dalmatia], its affiliates, subsidiaries, or investments including, without limitation, any information, recipes, ingredients, formula, methods,

>  lists, reports or presentations, whether in written, digital, visual, or verbal form, that identifies Products, their contents, or information related to such Products.

*Feldman Affidavit Ex. E* at 1.[3]  "Information" is defined by *what* it is, not by who provided it.

Nor do the Non-Disclosure Agreement's restrictions depend on the *source* of Dalmatia's confidential information.  Section 1(b) requires FoodMatch to "keep the Information confidential using the same degree of care used by [FoodMatch] to protect its own confidential information, but in no event less than a reasonable level of care.  [FoodMatch] shall not disclose any Information to any third party without the prior written consent of [Dalmatia]." *Id.* at 2.  Section 3 provides:  "The Recipient shall use the Information solely in connection with the Objective, and for no other purpose whatsoever." *Id.*[4]  Pursuant to Section 5(a), the obligations under the NDA remain in force for three years following termination of the distribution relationship. *Id.* at 3.

In support of its motion for summary judgment, FoodMatch writes:  "The Non-Disclosure Agreement describes 'Dalmatia' as the 'Discloser,' and FoodMatch as the recipient." *Feldman Affidavit* ¶ 14.  True, as far as it goes.  But then FoodMatch asserts that the Non-Disclosure Agreement "prohibits FoodMatch from using confidential information provided by Dalmatia (the Discloser) <u>to</u> FoodMatch (the Recipient.)" *Id.* (emphasis by FoodMatch).  FoodMatch offers no quotation or citation, and for good reason:  ***That is not what the Non-Disclosure Agreement says at all.***  The restrictions are on FoodMatch's use of "the Information," as defined above.  FoodMatch is required to keep confidential "any confidential

---

[3] The first "Whereas" clause indicates that the "Products" are the food products produced and important by Dalmatia and distributed by FoodMatch. *Id.*

[4] The second "Whereas" cause defines the "Objective" as evaluating and using Dalmatia's confidential information to share it with Buyers who request or require such information in connection with their purchase of Dalmatia's products and their resale to consumers. *Id.* at 1.

7

and/or proprietary information of [Dalmatia]" whether that information was provided directly by Dalmatia, or indirectly by Lancaster. FoodMatch must use the Information for the Non-Disclosure Agreement's defined "Objective, and for no other purpose whatsoever." FoodMatch is not relieved of its obligation because it acquires Dalmatia's information from Lancaster rather than directly from Dalmatia. (Indeed, the Non-Disclosure Agreement was signed in the first instance because FoodMatch wanted to visit Beanies and observe Beanies making the Dalmatia product. *Magee Dec.* ¶ 5.)

FoodMatch provides no analysis or authority to support its position, which is contrary to the plain language of the Non-Disclosure Agreement. As a matter of law, FoodMatch is not entitled to summary judgment.

\*     \*     \*

For the reasons stated above, Dalmatia respectfully requests that the Court deny FoodMatch's motion in its entirety.

Respectfully submitted,

/s/ *Michael S. Nadel*
Samuel E. Cohen (Pa. ID# 204617)
GROSS MCGINLEY, LLP
33 South Seventh Street, PO Box 4060
Allentown, Pennsylvania  18105
(610) 820-5450

Lauren E. Handel
HANDEL FOOD LAW LLC
75 Washington Valley Road #416
Bedminster, New Jersey  07921
(908) 206-4103

Michael S. Nadel
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 756-8000

*Attorneys for Plaintiff*
*Dalmatia Import Group, Inc.*

## CERTIFICATE OF SERVICE

      I hereby certify that on December 20, 2016, a true and correct copy of the foregoing was filed electronically using the CM/ECF system. As such, this document was served on all counsel who have consented to electronic service, including as follows:

*Counsel for Defendant FoodMatch, Inc.:*

Richard Feldman, Esq.
Michael Smith, Esq.
ROSENBERG FELDMAN SMITH, LLP
551 Fifth Avenue, Floor 24
New York, New York  10176

*Counsel for Defendant Lancaster Fine Foods, Inc., Earth Pride Organics, and Michael S. Thompson:*

George J. Krueger, Esq.
Alexandra C. Scanlon, Esq.
Brian Berkley, Esq.
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania  19103


                                                /s/ *Michael S. Nadel*
                                                Michael S. Nadel